UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X

JOHN DOE,                                               :
                                                        :    **Civil Action No:**1:22-cv-1115 (BKS/TWD)
                                                        :
                              **Plaintiff,**            :
                                                        :
                                                        :    **COMPLAINT & DEMAND**
                  **-against-**                         :    **FOR JURY TRIAL**
                                                        :
                                                        :
**SIENA COLLEGE,**                                      :
                                                        :
                              **Defendant.**            :
---------------------------------------------------------------------X

Plaintiff John Doe[1] ("Plaintiff" or "Doe"), by and through his attorneys, Nesenoff &
Miltenberg, LLP, as and for his Complaint against Defendant Siena College ("Siena" or the
"College" or "Defendant") respectfully alleges as follows:

## THE NATURE OF THIS ACTION

1.      Plaintiff John Doe, a rising senior at Siena College slated to graduate in May 2023,
brings this Complaint to remedy the devastating impacts of an improper and biased investigation
and adjudication by Defendant of certain false allegations made against Plaintiff by a fellow
student, Jane Roe,[2] which resulted in Plaintiff's suspension from Siena.

2.      On February 24, 2022, Plaintiff was notified by Siena that he was under
investigation for an alleged sexual assault, relating to a brief, consensual encounter he had with
Jane Roe, which Roe actively sought Plaintiff out for.

3.      Throughout the investigation and adjudication of Roe's claims, Jane Roe revealed
herself as entirely non-credible: she told materially inconsistent stories, her claims were directly

---

[1] Plaintiff has filed herewith a motion to proceed by pseudonym.
[2] Jane Roe is a pseudonym.

1

contradicted by video evidence and medical records, her claims were inconsistent with those of her own witnesses as well as neutral witnesses, and her claims were utterly unbelievable.

4.     Notwithstanding the complete dearth of evidence supporting Roe's claims—in fact, notwithstanding the plethora of evidence *directly contradicting* Roe's claims—Siena, through the engagement of biased individuals, employed a sham process intended to give the appearance of fairness but which was, in truth, a mere formality, wherein Plaintiff was presumed guilty from the start and was ultimately going to be found responsible regardless of the actual facts or evidence in the case.

5.     Siena's handling of the allegations against Plaintiff violated the contractual obligations promised by Siena to students, including Plaintiff, pursuant to Siena's published policies and procedures, was arbitrary and capricious, and violated the implied obligations of good faith and fair dealing inherent in all contracts. Moreover, Siena's findings and decisions exhibit clear evidence of gender bias that infected the proceedings, resulting in an erroneous outcome.

6.     Plaintiff is just seven months away from completing the requirements of his undergraduate degree, towards which he had been working diligently for the last three years. If Siena's improper decision is permitted to stand, Plaintiff will be immediately, irreparably, and seriously harmed, in that: (i) he will be deprived of the opportunity to timely complete his undergraduate coursework; (ii) he will be deprived of the timely issuance of his diploma; (iii) he will suffer severe reputational harm and stigma, by way of a permanent notation on his transcript indicating he was suspended after being found responsible for a code of conduct violation; (iv) he will lose the opportunity to begin full-time employment in the summer of 2023, pursuant to a previously-extended, highly competitive, ROTC job offer, which is expressly contingent upon Plaintiff's timely attainment of his undergraduate degree; and (v) he will forever have to explain

to any school, job, or program that he applies to, that he was suspended from Siena after a finding of sexual misconduct, thereby severely limiting his future education and career opportunities.

7.      For the foregoing reasons, to be explained in further detail below, Plaintiff seeks injunctive and monetary relief under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), as well as state law breach of contract claims.

## THE PARTIES

8.      Plaintiff John Doe is a natural person and citizen of a state other than New York.[3]

9.      Defendant Siena College is a private institution of higher education with an undergraduate enrollment of approximately 3,500 students, located in Loudonville, New York, 12211.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the case arises under the laws of the United States, specifically, under Title IX of the Education Amendments of 1972, as well as diversity jurisdiction pursuant to 28 U.S.C. § 1332, as the parties are citizens of different states and the amount in controversy exceeds $75,000.  This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367, as the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

11.     This Court has personal jurisdiction over Defendant Siena on the grounds that it is conducting business and principally located within the State of New York.

12.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391

---

[3] Plaintiff believes that identification of his state of residence may potentially identify him in this lawsuit. Plaintiff is prepared to provide a statement of his state of residence under seal, upon the Court's request.

because Siena is considered to reside in this judicial district and a substantial part of the acts or omissions giving rise to this action occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### I.    BACKGROUND

#### A. The April 2011 "Dear Colleague Letter": The Office for Civil Rights Places Pressure on Universities to Aggressively Pursue Sexual Misconduct Complaints

13.    On April 4, 2011, the Department of Education's Office for Civil Rights ("OCR") issued a guidance letter to colleges and universities in receipt of federal funding, which became widely known as the "April 2011 Dear Colleague Letter" (the "DCL").

14.    The DCL advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX of the Education Amendments of 1972 and its regulations, and the DCL directed schools to "take immediate action to eliminate the harassment, prevent its recurrence and address its effects." DCL at 4.

15.    The OCR, through the DCL, minimized due process protections for the accused by, among other things, mandating the adoption of a relatively low burden of proof—"more likely than not"— in cases involving sexual misconduct, expressly prohibiting colleges from applying a higher standard of proof.  (DCL at 10-11).

16.    Despite its purported purpose as a mere guidance letter, the Department of Education treated the DCL as a binding regulation and pressured colleges and universities to aggressively pursue investigations of sexual assault on campus.

17.    On April 29, 2014, OCR issued additional directives to colleges and universities in the form of a guidance document titled *Questions and Answers on Title IX and Sexual Violence* ("OCR's April 2014 Q&A") which was aimed at addressing campus sexual misconduct policies

and advised schools to adopt a trauma informed approach, advising, for example, that hearings should be "conducted in a manner that does not inflict additional trauma on the complainant." https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf OCR's April 2014 at 31.

18.    In addition, OCR's April 2014 Q&A continued OCR's quest to hamper students' ability to defend themselves by reducing or eliminating the ability to expose credibility flaws in the allegations made against them. *Id*. at 25-31.

19.    In the same month that the OCR issued its April 2014 Q&A on Title IX, the White House issued a report titled *Not Alone*, which included a warning that if the OCR finds a school in violation of Title IX, the "school risks losing federal funds." *See* White House Task Force to Protect Students from Sexual Assault, *Not Alone* (Apr. 2014), *available at* https://obamawhitehouse.archives.gov/sites/default/files/docs/report_0.pdf.    The report further advised that the Department of Justice ("DOJ") shared authority with OCR for enforcing Title IX, and could therefore initiate investigation, compliance review, and/or litigation against schools suspected of violating Title IX.

20.    To support its enforcement of the DCL, the OCR hired hundreds of additional investigators.   To date, OCR has conducted over five hundred investigations of colleges for the potential mishandling of complaints of sexual misconduct. *See Title IX: Tracking Sexual Assault Investigations*, Chronicle of Higher Education, https://projects.chronicle.com/titleix/ (last visited June 7, 2020).

21.    Colleges and universities, including Siena, were fearful of and concerned about being investigated or sanctioned by the DOE and/or of potential Title IX lawsuits by the DOJ. In response to pressure from OCR and DOJ, educational institutions, like Siena, have limited procedural protections afforded to males, like the Plaintiff, in sexual misconduct cases.

### B.  The 2017 Revocation of the DCL

22.    On September 22, 2017, the OCR formally rescinded the DCL and the April, 2014 Q&A, and put in place interim guidance (the "2017 Q&A"), while the current administration reviewed and revised its practices regarding the adjudication of complaints of sexual misconduct on college campuses. *See* Dep't of Ed., Dear Colleague Letter (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf; *see also* Dep't of Ed., *Q&A on Campus Sexual Misconduct* (Sept. 2017), https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

23.    In rescinding the 2011 DCL, the OCR noted that it had placed "improper pressure upon universities to adopt procedures that do not afford fundamental fairness," and "lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and *are in no way required by Title IX law or regulation*."  Dep't of Ed., Dear Colleague Letter (Sept. 22, 2017),    https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf. (citations omitted) (emphasis added).

24.    The 2017 Q&A suggests that the policies and procedures in place at Siena at all times relevant to this lawsuit—which were tailored in such a way as to comply with the DCL under the threat of loss of federal funding—were unfair and, ultimately, contrary to the goal of gender equality in Title IX proceedings.

25.    On information and belief, despite the sweeping changes caused by the rescission of the 2011 DCL and the implementation of the 2017 Q&A, Siena did not change its Title IX procedures.

### C.  The 2020 Title IX Final Rule

26.    On May 6, 2020, the Department of Education released new Title IX regulations,

which amended the Code of Federal Regulations for Nondiscrimination on the Basis of Sex in Education for Programs or Activities Receiving Federal Financial Assistance (the "2020 Title IX Final Rule") which carry the force and effect of law as of August 14, 2020. ("US Department of Education Releases Final Title IX Rule," available at https://www2.ed.gov/about/offices/list/ocr/newsroom.html).

27.    The 2020 Title IX Final Rule replaced all previously issued OCR guidance, including the rescinded 2017 Title IX Revised Sexual Harassment Guidance.

28.    The 2020 Title IX Final Rule provides respondents with procedural rights which the Plaintiff was deprived of during his own disciplinary proceeding, including the right to a *meaningful* live hearing. (*See* "Summary of Major Provisions of the Department of Education's Title IX Final Rule," available at https://www2.ed.gov/about/offices/list/ocr/docs/titleix-summary.pdf).

29.    Notably, Lois Goland, Siena's Title IX Coordinator, and the Title IX Coordinator during Plaintiff's Title IX case, previously expressed her lack of support for the 2020 Title IX Final Rule, for fear that the opportunity for cross examination (and the resultant ability to test witness credibility) would "creat[e] a deterrent to people coming forward with complaints." *See* Rick Karlin, *Revised assault rules debated,* WRAL News (Nov. 20, 2018), available at https://www.wral.com/revised-assault-rules-debated/18009250/.

### D.  N.Y. EDUCATION LAW ARTICLE 129-B

30.    On July 7, 2015, New York State Governor Andrew Cuomo signed into law Education Law Article 129-B ("Art. 129-B"), commonly known as "Enough is Enough," which became effective on October 5, 2015. *See* N.Y. Educ. L. § 6438 *et seq*.

31.    Art. 129-B applies to "any college or university chartered by the regents or

incorporated by special act of the legislature that maintains a campus in New York," including Siena College. *See* N.Y. Educ. Law 6439(1). It mandates that all such institutions, including Siena, adopt certain rules and procedures in connection with their sexual misconduct policies.

32.     Art. 129-B mandates that each institution file with the State a certificate of compliance with the law, as well as a copy of all written rules and policies adopted in accordance with the statute. If any institution fails to file a certificate of compliance, it will be ineligible to receive state aid or assistance until such time as it files the certificate. Art. 129-B also requires the State to conduct random audits to ensure compliance with the provisions of the statute.

33.     Art. 129-B sets forth a standard of care with which colleges, including Siena, and their agents and representatives, must comply when addressing complaints of sexual assault and disciplinary proceedings related thereto.

34.     In the instant case, Siena and its agents and employees breached their duty of care to Plaintiff as an enrolled student subject to disciplinary proceedings governed by Art. 129-B. As a result of this breach, Plaintiff suffered damages including loss of tuition payments, loss of education, and loss of future educational and career opportunities.

35.     Art. 129-B mandates that all New York State institutions of higher education, including Siena, "shall ensure" that every student be afforded the following rights:

> a.  The right "to have the complaint investigated and adjudicated in an impartial, timely, and thorough manner by individuals who receive annual training in conducting investigations of sexual violence, the effects of trauma, impartiality, the rights of the respondent, including the right to a presumption that the respondent is 'not responsible' until a finding of responsibility is made pursuant to the provisions of this article and the institution's policies and procedures;"

    b.   The right "to an investigation and process that is fair, impartial and provides a meaningful opportunity to be heard, and that is not conducted by individuals with a conflict of interest:"

    c.   "The right to a process . . . that includes, at a minimum: (i) notice to a respondent describing the date, time, location and factual allegations concerning the violation, a reference to the specific code of conduct provisions alleged to have been violated, and possible sanctions"

    d.   "[W]ritten notice of the findings of fact, the decision and the sanction, if any, as well as the rationale for the decision and sanction"; and

    e.   "[A] written statement detailing the factual findings supporting the determination and the rationale for the sanction imposed."

*See* N.Y. Educ. L. § 6444.

36.    Defendants violated these rights, as guaranteed by Article 129-B, by: (i) failing to provide Plaintiff, in the Notice of investigation, with the proper policy provision he was alleged to have violated; (ii) failing to conduct a timely, thorough, and impartial investigation into Roe's claims against Plaintiff; (iii) failing to afford Plaintiff the presumption of innocence; and (iv) failing to provide written notice of findings of fact that included a legitimate rationale for the finding of responsibility.

### E. Siena Faces Years of Complaints for Failing to Adequately Address Claims of Sexual Misconduct Allegedly Committed by Male Students and/or Faculty

37.    For years, Siena has faced student pressure regarding its failure to adequately address sexual misconduct complaints made against male students and faculty.

38.    Indeed, in 2016, a female student sued the College, claiming that the College acted negligently in failing to patrol the residence areas, thereby allowing a male to viciously rape her.

*See* Bethany Bump, *Ex-Siena student files lawsuit in sex assault case,* Times Union (Jun. 1, 2016), available at https://www.timesunion.com/local/article/Ex-Siena-student-files-lawsuit-in-sex-assault-case-7958242.php.

39.     In 2018, Siena's "Title IX Office, marketing team, and students" created a YouTube video "saying NO MORE to sexual assault." Notably, just about *every line* in this video referenced a female victim and a male perpetrator. For example, the video states "NO MORE 'but he's such a nice guy!' NO MORE 'Why doesn't she just break up with him?'" and "NO MORE 'She's too smart to let that happen.' NO MORE 'She seems fine to me.'" *See Siena College Says NO MORE*, YouTube (May 9, 2018), available at https://www.youtube.com/watch?v=1O6Uu2oBmRU.

40.     Siena's "No More" campaign was created and supported by the *very individuals involved in the investigation of the complaint against Plaintiff*. Indeed, "Title IX Associate Danielle Joyce collaborat[ed] with Title IX Coordinator Lois Goland, students, and the school's marketing team to create a beautiful campus NO MORE campaign that features powerful posters and public service announcements (PSAs)." *See How One College Created a Student-Driven No More Campaign for Sexual Assault Awareness Month*, No More (May 9, 2018), available at https://nomore.org/siena-college-says-no-more/.

41.     A female student in 2021 echoed the sentiment of Siena's lack of attention to the issue of sexual assault, noting, "I have been at Siena College for a little over a month now, and have already caught wind of three *reported* sexual assaults (one of which happened on the same day as our required sexual violence prevention training). *What has the college done to make us feel "safe" and "secure" you may ask?* Well, I am pondering the same question." *See* Madison Chetney, *Sexual Assault Should Not Be a Part of the College Experience*, The Promethean (Oct. 8, 2021), available at https://promethean.siena.edu/2021/10/08/sexual-assault-should-not-be-a-

part-of-the-college-experience/.

42.     Just this year, while Plaintiff's investigation was pending, Siena sought to demonstrate its commitment to the issue of sexual assault by teaming up with St. Peter's Health, and students packed approximately 500 care packages for sexual assault survivors. *See* Harrison Grubb, *Siena students pack hundreds of care packages for sexual assault survivors*, News 10 (Apr. 4, 2022), available at https://www.news10.com/top-stories/siena-students-pack-hundreds-of-care-packages-for-sexual-assault-survivors/.

43.     Moreover, while male students represent only 44% of Siena's population, the College's 2022 Annual Safety Report notes that the College offers for *women only* a "Rape Aggression Defense" taught by Campus Safety officers which is "a comprehensive course for women, which begins with awareness, prevention, risk reduction and avoidance, while progressing on to the basics of hands on defense training." *Siena 2022 Annual Security and Fire Safety Report*, available at https://www.siena.edu/files/resources/annual-security-report.pdf.

44.     On information and belief, the student and societal pressure placed on Siena as a result of the College's past failure to adequately address complaints of sexual assault made by females against males has prompted Siena to take a hard stance against males accused of sexual assault for fear of further backlash.

## II.     THE CHRONOLOGY OF EVENTS

### A.  John Doe and Jane Roe

45.     Plaintiff matriculated to Siena in the Fall of 2019, with an expected graduation date of May 2023. Plaintiff is a proud member of Siena's ROTC. As a rising Senior, Plaintiff was able to sign a contract with the United States Army to serve as Second Lieutenant for a minimum of four years following graduation.

46.     On information and belief, Jane Roe was a freshman at Siena at all relevant times herein, with an expected graduation date of May 2025.

**B. February 12-13, 2022**

47.     On the evening of February 12, 2022, Plaintiff was spending time with his friends in his dorm room in Padua Hall.

48.     Plaintiff and his friends were casually drinking. Plaintiff consumed approximately six to seven alcoholic seltzers over the course of several hours, beginning at approximately 8:00 p.m. Plaintiff was not intoxicated.

49.     At approximately 12:10 a.m., Plaintiff and several of his friends began walking towards a party that was to be held in off-campus apartments.

50.     While on the way to the party, Plaintiff ran into Jane Roe, and her two friends, R.L. and J.M., who informed Plaintiff that the party had been broken up by public safety officers.

51.     One of Plaintiff's friends then invited Jane Roe, R.L., and J.M. to a gathering in their dorm building, and the three women accepted the invitation. Plaintiff had no direct interaction with Roe until returning back to the dorm building.

52.     Neither Jane Roe nor her friends appeared intoxicated at this time. Indeed, all were speaking clearly and walking steadily. Siena's security video verifies that Jane, her friends, and all of the individuals including John Doe were able to navigate the icy and snowy walkways throughout campus.

53.     Upon returning to the dorm building at approximately 12:21 a.m., the group entered A.J.'s dorm room.

54.     Plaintiff did not see Jane Roe, R.L., or J.M. consume any alcohol while in A.J.'s room or at any point prior.

55.     While in A.J.'s dorm room, Roe began talking to several of Plaintiff's male friends. Roe then approached a female friend of Plaintiff's, S.G., and asked for her opinion of each male in the room.

56.     Roe noted that she was not looking for a relationship, and that she was only looking for sex.

57.     S.G. then told Roe that Plaintiff was not looking for a relationship at the time, and Roe responded with, "perfect."

58.     Roe then approached Plaintiff and the two exchanged names for the first time. Roe asked Plaintiff where his room was located, and Plaintiff stated his room number, which was two doors down the hallway.

59.     Roe grabbed Plaintiff's hand, and forcibly led Plaintiff towards his room.

60.     Roe escorted Plaintiff to the door of Plaintiff's dorm room, where Plaintiff's friend, A.A., was standing.

61.     Roe and A.A. briefly spoke while Plaintiff got his keys and opened his door. A.A. later stated that Roe was coherent and able to answer all questions without slurring any words during their conversation.

62.     Upon entering Plaintiff's room, Roe began to kiss Plaintiff without first obtaining consent from Plaintiff.

63.     Plaintiff, startled by Roe's aggression, then moved backwards to sit at his desk chair.

64.     Roe then asked Plaintiff which bed was Plaintiff's and jumped onto Plaintiff's bed on her own. Plaintiff followed, climbing onto his bed and laying down.

65.     Roe, on her own, climbed on top of Plaintiff to straddle him, and started kissing

Plaintiff again. Roe also began removing her own shirt while on top of Plaintiff.

66. At the time, Plaintiff's roommate, C.M., and C.M.'s girlfriend, S.O., were in Plaintiff's room.

67. In front of C.M. and S.O., Roe told Plaintiff that she did not want a relationship and was "just there for sex."

68. Roe then looked back and noticed that C.M. and S.O. were in the room.

69. Roe asked, "who is that?" and S.O. responded, "his roommate," before exiting the room.

70. Roe continued to fully remove her shirt and got back on top of Plaintiff in a straddling position. Roe kissed Plaintiff so aggressively, that Plaintiff had a difficult time breathing.

71. Roe unbuttoned Plaintiff's pants, again without Plaintiff's consent, and began performing oral sex on Plaintiff. Plaintiff did not say one word.

72. While Roe was performing oral sex on Plaintiff, she began to unbutton her own pants.

73. Roe grabbed Plaintiff's hand and guided it down towards her genital area. Plaintiff then inserted his finger into her vagina.

74. After a few minutes, Roe asked Plaintiff if he had a condom, to which Plaintiff replied that he did.

75. Plaintiff got off of his bed and retrieved a condom. Afterwards, he got back onto his bed and laid down with his hands at his sides.

76. Roe again climbed on top of Plaintiff, and without any assistance from Plaintiff, inserted Plaintiff's penis into her vagina and began to move up and down while Plaintiff laid on

his bed.

77.     After about 30 seconds, Plaintiff's roommate, T.R., entered the room briefly. After seeing Plaintiff and Roe, he left the room, slamming the door on his way out.

78.     Roe then leaned her entire bodyweight on Plaintiff to kiss him aggressively for about 10 to 20 seconds. Roe's face was pressing against Plaintiff's face. Roe, a Siena Rugby player is both taller and heavier than Plaintiff, and Plaintiff was unable to breathe.

79.     When Roe leaned on Plaintiff, Plaintiff smelled Roe's bad breath and was immediately repulsed and did not want to continue.

80.     Uncomfortable with Roe's aggressiveness, Plaintiff then placed his hands on Roe's collarbone area to gently push her off of him, shifting her weight to Plaintiff's left side, exclaiming "you're crushing me."

81.     Roe then began to tear up and said, "what are you doing?"

82.     On information and belief, Roe was extremely offended and embarrassed that Plaintiff had rejected her advances, and at that point was determined to get revenge.

83.     Roe then put Plaintiff's t-shirt on and left Plaintiff's room crying at 1:20 a.m.

84.     Video footage captured Roe leaving Plaintiff's dorm building with no noticeable injuries. Roe again demonstrated no signs of intoxication, walking upright and without wavering.

85.     Roe left the dorm building, and walked towards her dorm, where she encountered her friend, N.K., and N.K.'s boyfriend, R.P. Roe did not state anything regarding an assault. Rather, Roe merely asked N.K. to open up the door to the dorm building for her. Notably, R.P. did not note any injuries on Roe, despite his closeness to her.

86.     Roe then entered J.M.'s room, where J.M.'s roommate, G.M., was present.

87.     G.M., despite being mere feet away from Roe, did not note any specific injuries on

Roe.

88.    Once R.L. and J.M. returned to the room, Roe then claimed to G.M., R.L., and J.M. that she had been "raped."

89.    Meanwhile, Plaintiff sat in his bed for a few minutes following the encounter processing what had just happened. He then put his clothes on and walked back to A.J.'s room. Plaintiff sat on a chair in A.J.'s room and did not say one word.

90.    Roe's friend, R.L., messaged Plaintiff on Snapchat a few minutes later, asking "why would you do that?" and "what is wrong with you?"

91.    Plaintiff was extremely confused by R.L.'s messages, and showed S.G., asking "what do I say? I didn't do anything." S.G. advised him to not answer the messages.

92.    Plaintiff felt taken advantage of given Roe's aggressiveness, and sat silent in A.J.'s room, with the expression of a "deer in headlights."

93.    Plaintiff later returned to his room, and attempted to sleep that night, but woke up feeling mortified that he had been taken advantage of by Roe.

94.    In the following days and weeks, Plaintiff felt like a shell of his former self, and has since never felt the same.

95.    Plaintiff has become disassociated with the campus community after being taken advantage of by Roe. As a result, Plaintiff has felt uncomfortable and unsafe going to highly populated areas on campus such as the dining hall or even walking to class.

96.    In the following days, R.L. reached out to A.J., asking what made Roe so upset on the night of the sexual encounter. A.J. stated that he did not know, but that Plaintiff was extremely upset about it. R.L. responded by stating that she and Roe were "still gathering everything."

97.    In the late afternoon of February 13, 2022, Roe went to the hospital to undergo a

SANE evaluation. Notably, the nurse noted no bruising to Roe's neck nor did she identify any injury to Roe's lips.

98.    Roe also met with campus public safety to report the alleged incident, and again, the public safety officer noted no injuries.

99.    Roe returned to the hospital again the next day for a CT scan. Again, the medical report noted no bruising or lip injuries.

100.    On information and belief, in the days following the alleged incident, Roe and N.K. conspired with each other to have members of the men's rugby team beat Plaintiff up, as demonstrated in their text messages to one another.

### C.    The Title IX Report

101.    Roe continued her smear campaign against Plaintiff by proceeding to make a complaint of sexual assault against Plaintiff to the College's Title IX office on February 14, 2022.

102.    Roe, however, waited 10 days, until February 24, 2022, to file a formal Title IX complaint against Plaintiff.

103.    That same day, without performing any internal investigation into the validity of Roe's complaint, the College issued a Notice of Allegations to Plaintiff.

104.    The Notice of Allegations detailed that Plaintiff was under investigation for sexual assault, defined as "the carnal knowledge of a person (i.e. penile-vaginal penetration) without consent of that person," and Sexual Harassment, specifically for allegedly choking Roe.

105.    The Notice of Allegations clearly and unambiguously stated that the investigation revolved around the notion that Roe "*was incapacitated and therefore incapable of consent due to alcohol*."

106.    The Notice of Allegations made **no** other allegations of non-consent, other than

Roe's alleged incapacitation.

107.    Accordingly, Plaintiff focused the preparation of his defense on the issue of Roe's alleged incapacitation.

### D. The Title IX Investigation

108.    On March 3, 2022, Plaintiff and his advisor met with Siena's Title IX Coordinator, Lois Goland, for an initial meeting.

109.    Shocked at the allegations, Plaintiff's advisor mentioned that Plaintiff wanted to file a cross-complaint for sexual assault against Roe, given that Roe initiated all sexual contact without Plaintiff's consent.

110.    Goland scoffed at the mention of a cross-complaint for sexual assault made by a male against a female, and *threatened Plaintiff with retaliation* if Plaintiff were to bring such a complaint.

111.    Goland's aggressive response caused Plaintiff to forego filing a cross-complaint.

112.    After this initial meeting, Plaintiff did not hear one single word from Siena regarding the investigation *for 64 days*.

113.    The first contact Plaintiff received from Siena after the initial meeting was on May 6, 2022, where Plaintiff was informed that Siena employed outside counsel, Thomas S. D'Antonio, to conduct the Title IX investigation into Roe's allegations against Plaintiff.

114.    Investigator D'Antonio interviewed Roe and her female witnesses before interviewing Plaintiff and his male witnesses, treating Plaintiff's interview as a mere afterthought in the investigation.

115.    Indeed, *six* female witnesses were interviewed before a male was even spoken to in

the investigation.

116.    Incredibly, despite being notified of the allegations on February 24, 2022, Plaintiff was not interviewed until May 25, 2022, 90 days later.

117.    After his interview with Investigator D'Antonio, another 43 days passed of complete silence.

118.    Investigator D'Antonio did not release his Preliminary Investigative Report until July 7, 2022—*four months* after the investigation began. Notably, Plaintiff had told Investigator D'Antonio during the investigation that he would be away fulfilling his Siena ROTC obligations for the month of July. Investigator D'Antonio, however, waited until he knew Plaintiff was away to issue the report, causing an unnecessary delay in the investigation.

119.    In the Preliminary Investigative Report, Investigator D'Antonio created "summaries" of his interviews with the parties and witnesses. Notably, the full transcripts and/or recordings of the interviews were never produced to Plaintiff, and therefore, Plaintiff had no way of comparing the summaries with the full interview notes to determine what had been excluded or altered in the Preliminary Investigative Report.

120.    The investigation was completed on August 22, 2022, *179 days from the day Plaintiff received notice of the allegations*, with the issuance of the Final Investigation Report and Exhibits.

### E.  The Title IX Hearing

121.    On August 24, 2022, Plaintiff was notified via email that Kelly Gallagher, Senior Solutions Specialist at Grand River Solutions, had been hired by Siena to serve as the sole adjudicator in Plaintiff's case.

122.    Plaintiff timely objected to Gallagher serving as the Hearing Officer, given that

Gallagher had been involved in several matters with attorneys from the firm that was serving as Plaintiff's advisor. Indeed, Plaintiff's advisor himself was lead counsel for an accused student in a pending lawsuit for which Gallagher's alleged bias and misconduct was the crux of the litigation.

123.     Accordingly, Plaintiff requested that Gallagher be removed as Hearing Officer given Gallagher's conflict of interest which would impede a fair and impartial process.

124.     On August 25, 2022, Goland emailed Plaintiff seeking additional information regarding Plaintiff's request to remove Gallagher.

125.     Plaintiff's advisor responded to Goland, explaining that the referenced litigation was under a court ordered protective order, and as such, he was unable to provide any additional information besides the fact that *Gallagher's conduct during another university hearing* was the crux of the litigation.

126.     On August 29, 2022, despite the clear conflict of interest and threat to the impartiality of Plaintiff's hearing, Goland denied Plaintiff's request to have Gallagher removed as hearing officer.

127.     That same day, Plaintiff's advisor emailed Goland, requesting that she reconsider the decision, but Goland again denied the request.

128.     Plaintiff's advisor then very specifically asked Goland if Gallagher had been advised of Plaintiff's attempt to have her removed as Hearing Officer. Plaintiff's advisor also requested a pre-hearing conference.

129.     Goland responded on August 31 stating that a pre-hearing conference would be scheduled, but ignored the question of whether Gallagher had been made aware of Plaintiff's request to have her removed as Hearing Officer.

130.     On September 12-14, 2022, Siena conducted an adjudicatory hearing of Roe's

allegations against Plaintiff.

131.   On the first day of the hearing, it became clear that Gallagher *had* been informed of Plaintiff's request to have her removed, as Gallagher asked, "does either party have an objection *that has not already been raised and addressed* related to me serving as the hearing officer?"

132.   On information and belief, Gallagher's knowledge of Plaintiff's request, and the College's failure to notify Plaintiff of such, created a biased hearing from the start, in which Gallagher sought to have Plaintiff found responsible as a male accused.

133.    The hearing revealed even more blatant inconsistencies in Roe's story as she continued to impose self-serving shifts in her version of the events. Glaring credibility concerns were highlighted as her story was contradicted by her own prior words and those of her witnesses.

134.   For example, Roe claimed at the hearing that she hit her head on the night of the alleged incident, but that she did not report it when she went to the hospital the next morning because she only remembered afterwards.

135.   Indeed, hospital medical records from both February 13 and February 14 indicate *no injuries* on Roe: no bruising on her neck, no head injuries, and no lip injuries. Roe and her friends, however, claimed otherwise:

   a.  When asked why the hospital medical reports from both February 13 and February 14 indicated no bruising on her neck, Roe claimed that the bruising just had not "shown up" yet at that point;

   b.  J.M. testified at the hearing, in an effort to, on information and belief, bolster Roe's false claims of injury, that Roe told her, the morning after the incident (and before she went to the hospital) that her head was slammed against the wall during the alleged incident, even though Roe did not report this to the

21

hospital just a few hours later;

c.  N.K., claimed that upon seeing Roe after the alleged incident in the early morning of February 13, that Roe's neck was red and had fingerprint marks on it, again in direct contradiction to medical records that were produced just hours later.

136.    On information and belief, Roe and her friends created a false story to paint Plaintiff as a violent rapist; however, their contradictions were exposed during the hearing, because their stories were completely falsified.

137.    J.M. further testified that she and Roe walked past a security guard in the dorm lobby in the early morning of February 13, after the alleged incident. When asked why they did not talk to the security guard about the event, J.M. claimed it was because Roe was "freaking out."

138.    Incredibly, the Hearing Officer did not question how or why a trained security guard would not notice, approach, or offer to help a young woman who was allegedly "freaking out" and injured.

139.    Indeed, video surveillance footage showed Roe walking calmly in close proximity to the security guard, again with no visible injuries.

140.    Roe further claimed that she had a bruised and bloodied lip, as shown in her submitted, undated, photographs, which she claimed to have taken of herself on the morning of February 13.

141.    However, when Plaintiff's advisor confronted Roe in questioning at the hearing and pointed out that she was wearing different clothes in each of the two photographs and that the two pictures of her lip showed two completely different injuries, Roe then changed her story and admitted that all of the photographs were *not* taken on the morning of February 13, as she

previously claimed. Further, Roe again changed her story and stated that J.M. was the individual that took the photographs.

142.    Notably, the only individuals that supported Roe's "bloodied lip" story were her friends:

a.    J.M. testified that Roe's lip was gashed open, bloody, and like a balloon. J.M. stated at the hearing that Roe's lip was the first thing she noticed when she saw Roe in the early morning of February 13. However, *J.M. testified that she did not take photographs of Roe on the morning of February 13, but rather, a few days later*.

b.    R.L. claimed that Roe's lip was "completely destroyed" upon seeing her in the early morning of February 13.[4]

c.    N.K. stated that Roe's bottom lip was split open and bloody following the alleged incident.

143.    However, the facts presented at the hearing, including video surveillance and all witnesses who were *not* Roe's close friends, clearly and unmistakably demonstrated that Roe had no such lip injury. Roe claimed that this injury occurred during the encounter, when Plaintiff bit her lip. However, Plaintiff never bit Roe's lip, and no neutral witness ever recounted seeing Roe's alleged lip injury.

a.    Video surveillance footage of Roe leaving Plaintiff's dorm building shows Roe not once touching her lip or attempting to wipe blood away, despite Roe's

---

[4] Notably, R.L. specifically requested to retract her statement after her interview with the Investigator and stated that she did not feel comfortable giving a statement. However, her statement was still included in the investigation report and was relied upon by Gallagher in rendering a decision.

claims that her lip was gashed open and bleeding. The video also demonstrates no blood on Roe's white shirt.

b.   G.M., who is not close friends with Roe and only knows Roe through her roommate, J.M., stated that while Roe was in G.M.'s room awaiting the arrival of J.M., she *did not see any injuries on Roe*. In other words, G.M. saw Roe just minutes before J.M. and R.L. saw Roe and claimed that Roe had a "gashed open" lip, and to this day still never saw a lip injury. Roe even slept in G.M.'s room the night after going to the hospital, and G.M. testified at the hearing that *Roe had no lip injuries on this day as well.*

c.   N.K.'s boyfriend, R.P., whom Roe ran into in the hallway just minutes after the alleged encounter, testified that *he did not notice any injuries on Roe*.

d.   The public safety officer whom J.M. and Roe passed, and who can be seen in video surveillance making direct eye contact with Roe, never stopped Roe, despite the alleged "gashed open" lip.

e.   At approximately 3:48 p.m. on February 13, Roe met with Siena Public Safety Officer, William Foro, to report the alleged assault. Roe never mentioned the lip injury to Foro, and Foro did not document any such injury.

f.   Roe also met with Siena's Director of Community Learning, James Calechman, on February 13 to report the alleged assault, and likewise, Calechman's report *does not make any mention of a lip injury*.

g.   Roe presented *twice* at the hospital, once in the afternoon of February 13, and once in the afternoon of February 14, and neither medical report mentions any

injury to Roe's lip or neck.

144.    Moreover, Plaintiff submitted a sworn declaration from a doctor, that was fully accepted by Siena and was to be considered by the Hearing Officer, which refuted any claim of injury by Roe, and disputed the authenticity of the photographs submitted by Roe in support of her claims. The declaration reads:

> PA Wilson documented [Roe's] "subjective" complaints of "…. a bruised and bleeding lower lip from him biting her lip" and the "subjective" examination findings of "tender to palpation". These types of charted statements are referred to in the medical community as "subjective" complaints. **Whereas PA Wilson's documentation of her physical examination findings of "no bruising appreciated" and "normocephalic and atraumatic"** in [Roe's] chart are what is known as an **"objective" finding, meaning things that the medical clinician can verify and see for themselves.**

> [R.L.] described [Roe's] lip, in the early morning hours of February 13, 2022 as "completely destroyed" and that she saw blood. [J.M.] noted that [Roe's] lip was "really cut up". [N.K.] stated that she saw [Roe] in the early morning hours of February 13, 2022, outside on the walkway between dorms, and said she had a "fat lip and was bleeding." **It is my opinion, within a reasonable degree of medical certainty, that the two photographs of what I am led to believe were of [Roe's] lip as of the morning of February 13, 2022, are not consistent with each other, appearing as if they were taken at very different times/days or are two different injuries altogether.** The second picture of [Roe's] lip, in the series of the 16 photographs, depicts missing skin/lip on the bottom of the lower lip which is not present in the first photograph.

> Based on the two photographs of what I am led to believe were of [Roe's] lip as of the morning of February 13, 2022, combined with the statements of [R.L.], [J.M.] and [N.K.], **it is my opinion, within a reasonable degree of medical certainty, that [Roe] would have presented to Samaritan Hospital on February 13th and 14th with a visible lip injury. As noted above, [Roe] did not present to Samaritan Hospital, on February 13th and 14th with a visible lip injury.**

> [Roe's], [R.L.'s], [J.M.'s] and [N.K.'s] descriptions of [Roe's] alleged injured lip and the alleged injury as depicted in the photographs simply do not align **with the independent and objective findings of no visible lip, head or neck injury ("atraumatic" head exam) as documented by PA Wilson as noted above.**

> Additionally, **I am unable to find corroboration within the medical documentation as to [Roe's] recitation of what some unidentified hospital examining clinician is purported to have said, "it looks like [Roe] was choked**

**until she passed out", because [Roe's] hospital chart does not contain any such notation.** It is my opinion, within a reasonable degree of medical certainty, that [Roe's] Samaritan Hospital February 13th and **14th chart contains no information** that would have led an examining clinician to tell [Roe] that it looks like you were "choked until you passed out".

145.    Roe's lies continued at the hearing, wherein she testified that J.M. and R.L. heard S.G. tell Roe at the party to "stay away" from two of the males in the room, one of them being Plaintiff.

146.    However, J.M. and R.L. both denied knowledge of any such statement, and specifically stated that had they heard such a statement, they would not have been comfortable letting Roe leave the gathering with Plaintiff. J.M. emphasized that it would be false if Roe claimed that J.M. was present for any such conversation with S.G.

147.    Despite glaring inconsistencies in Roe's shifting story, and clear contradictions made by her own witnesses, Gallagher did not ask Roe any follow up questions that could negatively affect Roe's credibility. For example, Gallagher did not ask Roe how it is possible that no one other than Roe's friends saw any injuries on her at all—making Roe's claims completely implausible and yet totally untested by Gallagher.

148.    As an experienced adjudicator, it is not plausible that Gallagher simply "missed" countless opportunities to seek clarification from Roe and her witnesses about obvious and material discrepancies in virtually every aspect of their stories. This is evidenced by Gallagher's careful attention to detail and dogged questioning when it came to any conceivable issue with Plaintiff's version of events. The only plausible explanation is that Plaintiff was presumed guilty from the start and Gallagher was carefully avoiding any action that might damage the female complainant's and female witnesses' credibility.

F.  **The Outcome**

149.    On September 28, 2022, Gallagher issued the Outcome Letter for Plaintiff's case (the "Outcome Letter"). Gallagher found Plaintiff responsible for sexual assault and sexual harassment, and recommended a sanction of a two-year suspension. Notably, despite believing Roe's claims of a violent rape, Plaintiff is able to return to campus following his suspension, thereby demonstrating that he is not a threat to the campus community.

150.    Although Plaintiff's Notice of Allegations alleged that Plaintiff had sexual intercourse with Roe while Roe was incapacitated and therefore unable to consent, **the Outcome Letter found that Roe was *not* incapacitated** at the time of the sexual encounter.

151.    Due to the Notice of Allegations, Plaintiff was led to believe throughout the entirety of the investigation and hearing, that Roe's allegations of lack of consent were centered entirely on her position of incapacitation, and as such, Plaintiff's defense was premised on that understanding.

152.    Instead of properly performing her role and finding Plaintiff not responsible of the allegations for which he was provided notice, Gallagher in furtherance of her gender-biased agenda, changed the theory of the case without providing Plaintiff notice, and found Plaintiff, as a male accused, responsible for an allegation for which he was never provided notice.

153.    Indeed, despite the fact that the evidence clearly established that Roe was not incapacitated, Gallagher abandoned the initial theory of incapacitation and found Plaintiff responsible for a generic allegation of engaging in sexual activity without consent, which is a very different and distinct charge.

154.    Had Plaintiff been provided notice of the separate charge, Plaintiff would have focused his defense more on Roe's words and actions rather than focusing on the behaviors that

demonstrated that Roe was not incapacitated.

155.    On information and belief, Gallagher had pre-determined her decision to find Plaintiff responsible as a male accused, and in turn defaulted to an entirely different charge.

156.    Gallagher also made false conclusions about Roe's credibility in her crusade to find Plaintiff responsible, ignoring glaring inconsistencies and leaving gaping holes in her reasoning.

157.    Despite finding that Plaintiff consistently maintained that the sexual encounter was consensual, that Roe's account had "evolved over time," and that Roe consistently maintained an inability to recount all of the events from the night, Gallagher still found Roe's story more plausible than Plaintiff's.

158.    In other words, despite the fact that Roe's story had *continually evolved* and changed to meet her own agenda, and despite Plaintiff's account remaining consistent, and not being contradicted by the evidence or witnesses, Gallagher still found Roe more credible.

159.    Gallagher's decision rested largely on Roe's story being "corroborated" by Roe's submitted photographs. However, these photographs were *undated,* and questions were raised regarding their authenticity. The credible evidence presented at the hearing unambiguously established that Roe lied about who took the photographs, and more importantly, lied about the date that they were taken. The photographs submitted by Roe, were, in reality, highly questionable, suspect, and entirely unreliable pieces of evidence.

160.    However, on information and belief, Gallagher relied on and focused on these photographs because they served her own anti-male bias and supported the female accuser's story.

161.    Gallagher's Outcome Letter shockingly contained *no* substantive analysis of Roe's voluminous, demonstrable lies and changes of narrative. Incredibly, the Outcome Letter *did not*

*even mention troughs of evidence that discredited Roe's account.*

162.    First, Gallagher failed to even mention the account of R.P., who saw Roe just moments after she had allegedly been violently choked, raped, and left with a busted and bloody lip, and saw no injuries on Roe.

163.    Gallagher also attempted to completely discredit the testimony of G.M. which established that Roe had no injuries on the night of the alleged incident, by qualifying G.M.'s statements, saying that G.M. remained on her bed, while Roe remained on J.M.'s bed.

164.    On information and belief, this statement was included solely to make an excuse for the benefit of Roe as to why G.M. did not see any injuries either on the night of the incident or the next evening when Roe slept over in her room. In making this statement, however, Gallagher purposefully omitted from the Outcome Letter that G.M. *told Gallagher that she was only sitting two feet away from Roe, with L.E.D. lights on in the room* that evening.

165.    On information and belief, Gallagher left this detail out because any reasonable, fair-minded, and unbiased person would absolutely expect a person who is sitting a mere two feet directly across from a person, with L.E.D. lights on, who just told them they were raped, would see a lip that was, as claimed, gashed, bloodied, and swollen.

166.    Indeed, when Roe's own advisor specifically asked G.M. if she had observed any injuries to Roe on the night of the alleged incident, the night of February 13, or the morning of February 14, G.M. unequivocally stated that she did not. However, this testimony was left out of Gallagher's decision entirely.

167.    In keeping with her scheme to omit critical evidence that was detrimental to her biased agenda, Gallagher's Outcome Letter completely ignored the sworn testimony, and the only testimony given under oath, of the Board-Certified Emergency Room Physician that discredited

Roe's claims of injury. Indeed, the Outcome Letter failed to mention that the doctor even participated in the investigation of the matter.

168.    Moreover, the Outcome Letter also failed to mention the fact that neither the Public Safety Officer nor the Director of Community Living, whom Roe had direct contact with, documented any injuries following their meetings with Roe, mere hours after the injuries were allegedly inflicted on her face.

169.    Gallagher not only ignored eyewitnesses who refuted Roe's claims, but also ignored and did not mention Roe's medical records, which at no time document any injury to Roe's lip or neck, and therefore confirm that there were no such injuries present on either February 13 or February 14, the days immediately following the alleged incident.

170.    Despite the swaths of evidence refuting Roe's claims of a lip injury, and calling into question the authenticity of the photographs submitted by Roe, Gallagher's Outcome Letter brazenly and conclusively stated that Roe's injuries, *including her injured lip*, were corroborated by *contemporaneous* photographs.

171.    Gallagher further noted that Roe's story of the encounter shifted as Roe made no mention of Plaintiff performing oral sex on her at the hospital, and only claimed this, for the first time, when interviewed by Siena's investigator. Plaintiff, however, maintained consistently that he never performed oral sex on Roe.

172.    Despite no corroborating evidence, and a clear demonstration of Roe's inconsistent story, Gallagher *still* found that Roe's version of events was "more plausible."

173.    Roe's story also changed with regard to her performing oral sex on Plaintiff. Indeed, Gallagher noted that at the hospital, Roe stated that she refused when Plaintiff requested oral sex, but Roe told the investigator that Plaintiff "forced" his penis into her mouth. Plaintiff, however,

maintained consistently that Roe removed his pants and voluntarily performed oral sex on him.

174.    Again, despite a lack of corroborating evidence, and despite the clear credibility concerns of Roe's shifting story, Gallagher, with no explanation, determined that Roe did not consent when Plaintiff "placed" Roe's mouth on his penis.

175.    Gallagher did not base her conclusions on any factual basis or evidence presented at the hearing: it was a pure, personal judgment by Gallagher that Plaintiff was guilty as a male accused.

176.    In sum, Gallagher's conclusions fly in the face of all logic and reason, utterly ignored the actual evidence presented in the case, failed to apply the proper policy definitions, and were in all ways tailored as a prosecution against Plaintiff, and not a fair, impartial decision.

177.    In addition to her erroneous and gender-based findings, Gallagher imposed an unduly harsh sanction of a two-year suspension.

### G. Plaintiff's Appeal

178.    Pursuant to Siena's policies, Plaintiff submitted an appeal of the decision finding him responsible, and the sanction of suspension, on October 7, 2022.

179.    In the appeal, Plaintiff addressed: (i) numerous violations of Siena's sexual misconduct policies on the part of Siena's Title IX investigator and adjudicator; and (ii) clear conflict of interest and bias on the part of the adjudicator.

180.    The appeal presented a detailed analysis of the evidence in the case, the relevant policy provisions, and the specific and undeniable failures by Siena and its agents/employees to follow the policies and apply the appropriate standard of review in an impartial manner.

181.    Once Plaintiff submitted his appeal, Goland gave Roe an extension of time to submit her response to Plaintiff's appeal, despite Roe having never asked for an extension.

182.    On October 17, 2022, Jane Roe submitted a response to Plaintiff's appeal.

183.    On October 25, 2022, Siena denied Plaintiff's appeal, finalizing his suspension ("Appeal Outcome Letter").[5] The Appeal Outcome letter disregarded most of Plaintiff's arguments about adjudicator bias and failure to account for evidence, and wrote off the rest of Plaintiff's concerns with minimal explanation.

184.    Indeed, the Appeal Outcome Letter makes *no reference to any policy provision* discussed in Plaintiff's appeal.

185.    Worse, the Appeal Outcome Letter completely ignores and never addresses Plaintiff's argument that he had been found responsible for a charge for which he never received a notice of allegations.

186.    Plaintiff has therefore exhausted his administrative remedies and this lawsuit represents the last and only option for him to right the wrongs occasioned by Defendant's misconduct and to clear his name.

### III.    AGREEMENTS, REPRESENTATIONS, COVENANTS AND WARRANTIES BETWEEN PLAINTIFF AND SIENA

187.    Upon Plaintiff's acceptance to Siena, Siena provided Plaintiff with the Siena College Sexual Misconduct and Interpersonal Violence Policy (the "Policy"), which sets forth prohibited actions and definitions, as well as the process for investigating and adjudicating sexual misconduct claims.

188.    On information and belief, the Policy is revised each new school year.

189.    The Policy contains express and implied promises from Siena to its students, including Plaintiff John Doe, with regard to how it will address and adjudicate complaints of sexual

---

[5] The Appeal Outcome Letter states that Plaintiff must leave campus within five business days.

misconduct.

190.    Throughout the investigation and adjudication of Jane Roe's Title IX complaint

against Plaintiff, Siena breached its obligations and promises under the Policy.

191.    The Policy defines "Title IX Sexual Assault" as: "The carnal knowledge of a person

(i.e., penile-vaginal penetration), without the consent of that person, including instances where the

person is incapable of giving consent because of their age or because of their temporary or

permanent mental or physical incapacity."

192.    The Policy defines "Affirmative Consent" as:

Affirmative consent is a knowing, voluntary, and mutual decision among all
participants to engage in sexual activity. Consent can be given by words or actions,
as long as those words or actions create clear permission regarding willingness to
engage in the sexual activity. Silence or lack of resistance, in and of itself, does not
demonstrate consent. The definition of consent does not vary based upon a
participant's sex, sexual orientation, gender identity, or gender expression.

Consent will be determined with the following principles in mind:

● Consent to any sexual act or prior consensual sexual activity between or with any
party does not necessarily constitute consent to any other sexual act
.
● Consent is required regardless of whether the person initiating the act is under
the influence of drugs and/or alcohol.

● Consent may be initially given but withdrawn at any time.

● Consent cannot be given when a person is incapacitated (see definition below).

● Consent cannot be given when it is the result of any coercion, intimidation, force,
or threat of harm.

● When consent is withdrawn or can no longer be given, sexual activity must stop.

193.    Notably, the Policy *specifically* defines "incapacitation" and delineates what will

be considered when lack of consent is allegedly due to the incapacitation of the complainant:

Consent cannot be given when a person is incapacitated, which occurs when an
individual lacks the ability to knowingly choose to participate in sexual activity.

Incapacitation may be caused by the lack of consciousness or being asleep, being involuntarily restrained, or if an individual otherwise cannot consent. Depending on the degree of intoxication, someone who is under the influence of alcohol, drugs, or other intoxicants may be incapacitated and therefore unable to consent.

**For purposes of determining whether a Respondent is responsible for a violation of this policy due to their engaging in sexual activity without consent with a person who was incapacitated, the College will assess whether a Respondent knew or a reasonable, sober person in the Respondent's circumstances should have known, that the other individual was incapacitated.** A person's responsibility for obtaining consent is not diminished by their use of alcohol and or other drugs. Being intoxicated or impaired by drugs or alcohol is never an excuse for Prohibited Conduct. (emphasis added).

194.    Siena violated its provisions on sexual assault and affirmative consent by failing to apply the proper definitions and parameters in the evaluation of Roe's claims against Plaintiff. Specifically, the Policy makes clear that a theory of incapacitation is separate and apart from a general theory of non-consent, and as such, Plaintiff was not aware of the exact theory under which he was being investigated.

195.    The Policy states that students have the right to "Participate in a process that is fair, impartial, and provides adequate notice and a meaningful opportunity to be heard; *Respondents are presumed not responsible until the grievance process has concluded*." (emphasis added). The Policy further states: "proceedings that involve alleged violations of this policy will be conducted through a process that is prompt, equitable, fair, impartial, and provides adequate notice and a meaningful opportunity to be heard, as outlined below and in accordance with applicable law." Siena violated this Policy in a myriad of ways, including, but not limited to:

> a.  Siena violated the Policy because the complaint involving Plaintiff was not resolved in a manner that was fair or impartial, but instead, in a way aimed to placate the female complainant and repair Siena's damaged reputation for

failing to protect women, ignoring the relevant evidence.

b. Siena further violated the Policy because the right to be heard necessarily includes the right to be heard by an impartial adjudicator, which Gallagher clearly was not.

c. Siena further violated the Policy because, based upon the uniform efforts of Siena's agents and employees, including adjudicator Gallagher, to completely ignore the blatant evidence discrediting Roe's claims and to structure the entire process as a prosecution, rather than an investigation, Plaintiff was presumed guilty from the start and was consistently leaned upon to prove his innocence.

d. Siena violated the Policy because the overwhelming evidence supported Plaintiff's version of events and disproved Roe's allegations, yet Plaintiff was still found responsible.

196.   The Policy states: "In selecting a hearing officer for a particular matter, the Title IX Coordinator/EOS or designee will take care to select an individual who does not have a conflict of interest or bias against Complainants or Respondents generally or an individual Complainant or Respondent. The College will notify the parties of the identity of the hearing officer in advance of the hearing, and parties may, within three (3) business days of such notice, object to the service of the hearing officer by providing a written statement (which may be transmitted electronically) as to why the party believes that the hearing officer has a conflict of interest or bias." Siena violated this Policy in a myriad of ways, including, but not limited to:

a. Siena violated the Policy by appointing Gallagher as Hearing Officer, when Gallagher had a conflict of interest given that she was involved in litigation with

the law firm of Plaintiff's advisor.

b. Siena further violated the Policy by appointing Gallagher as Hearing Officer given Gallagher's clear bias against Plaintiff as a male respondent.

c. Siena further violated the Policy by refusing to remove Gallagher as Hearing Officer at Plaintiff's request, and worse, informing Gallagher of Plaintiff's request, only making her bias against Plaintiff worse from the outset.

197. The Policy further states: "If in the course of an investigation the College decides to investigate allegations about any party that are not included in the notice described above, it will provide notice of the additional allegations to the parties whose identities are known." Siena violated this Policy in a myriad of ways, including, but not limited to:

a. Siena violated the Policy by only informing Plaintiff that the issue of consent was being investigated under an incapacitation theory, and never informing Plaintiff of a general consent theory before finding him responsible for sexual assault.

198. The Policy states: "The College will endeavor to complete the investigation portion of the process within 90 business days of issuing a notice of investigation as described above, but this may be extended at the College's discretion due to factors such as the complexity of the matter, the availability of witnesses, requests by law enforcement agency for a temporary delay in the investigation process, College breaks, and other legitimate reasons." Siena violated this Policy in a myriad of ways, including, but not limited to:

a. Siena violated the Policy by failing to complete the investigation within 90 business days, and failing to provide legitimate reasons for any delay.

199. The Policy states that: "The preponderance of evidence or 'more likely than not'

standard of review will be used during the formal resolution process." Siena violated this Policy in a myriad of ways, including, but not limited to:

      a.   Siena violated the Policy because the evidence in this case overwhelmingly supported Plaintiff's version of the events and completely disproved Roe's version of events, yet Plaintiff was inexplicably found responsible.

## IV.    <u>PLAINTIFF'S DAMAGES</u>

200.    As a result of Defendant's unlawful, unfair, gender-biased, and improper conduct, Plaintiff was subjected to a disciplinary process that failed to comport with Siena's promises to Plaintiff as an enrolled student, the tenants of Title IX, and principles of good faith and fundamental fairness.

201.    As a result of Defendant's unlawful, unfair, gender-biased, and improper conduct, Plaintiff was improperly suspended from Siena during his senior year, with a post-graduation job offer pending, depriving him the benefits of years of hard work, and tuition.

202.    As a result of Defendant's unlawful, unfair, gender-biased, and improper conduct, Plaintiff has been falsely labeled as a perpetrator of sexual assault and his records from Siena will permanently bear a notation stating that he was suspended as a result of violating the Policy.

203.    As a result of Defendant's unlawful, unfair, gender-biased, and improper conduct, Plaintiff's academic/disciplinary file and transcript are now marred by a false and baseless finding of sexual assault and suspension.

204.    As a result of Defendant's unlawful, unfair, gender-biased, and improper conduct, Plaintiff will lose the opportunity to begin his previously accepted post-graduation employment offer and enter the work force in the Summer of 2023, as he has always planned to do.

205.    As a result of Defendant's unlawful, unfair, gender-biased, and improper conduct,

Plaintiff will have to disclose to any future educational institution or professional program, licensing authority, or job that he applies to that he was found responsible for committing a heinous sexual assault, effectively destroying any chance for Plaintiff to achieve success academically or professionally in the future.

206.    As a result of Defendant's unlawful, unfair, gender-biased, and improper conduct, Plaintiff's education and career path have been derailed, resulting in considerable economic and consequential harm.

207.    As a result of Defendant's unlawful, unfair, gender-biased, and improper conduct, Plaintiff was subjected to a gender-biased, fundamentally unfair investigation and adjudication process which destroyed his reputation, precluded him from receiving the education he was promised by virtue of his enrollment at Siena, and has impacted and will permanently impact his education and career prospects.

208.    As a result of Defendant's unlawful, unfair, gender-biased, and improper conduct, Plaintiff has suffered and will continue to suffer reputational harm, ridicule, fear, persecution, pecuniary harm, deprivation of his education and damage to his education and career prospects.

## AS AND FOR A FIRST CAUSE OF ACTION
### Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq*.
### (Erroneous Outcome)

209.    Plaintiff John Doe repeats and realleges each and every allegation above as though fully set forth herein.

210.    Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

211.    On information and belief, Siena, at all times relevant to this Complaint, received and continues to receive federal funding and is therefore subject to liability under Title IX of the Education Acts of 1972, 20 U.S.C. § 1681(a).

212.    Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, including Defendant Siena.

213.    Title IX is enforceable through a private right of action, for monetary damages as well as injunctive relief.

214.    Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline. *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994).

215.    The Second Circuit has observed that there are several theories available to a Plaintiff alleging gender bias in violation of Title IX. One of those theories is known as the "erroneous outcome" theory.

216.    "Plaintiffs who claim that an erroneous outcome was reached must allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding" and "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994).

217.    Siena violated Title IX in the instant case because Siena reached an erroneous finding that Plaintiff was responsible for sexual misconduct, and gender bias was a motivating factor in the wrongful finding.

218.    The outcome was erroneous because, by way of example and not limitation:

    a.    Siena completely ignored the concrete evidence disproving Roe' s allegations, to wit, the video surveillance footage captured just minutes after Roe was allegedly violently raped and left with a gashed and bleeding lip, showing that

39

Roe was, in fact, not injured or bleeding;

b.   Siena ignored the voluminous lies and inconsistencies told by both Roe and her witnesses, including (i) whether Roe "remembered" that she hit her head given that J.M. testified that Roe told her the morning before going to the hospital that she did, but then failed to disclose this injury to the hospital and claimed that she did not remember until later; (ii) whether Roe had bruises on her neck, as Roe and her friends claimed, however, no bruises were noted by the hospital nor by any witnesses that were not Roe's friend; (iii) whether Roe had a gashed lip, again as claimed by Roe and her witnesses, whereas no such injury was noted by the hospital, nor any witnesses that were not Roe's friends, nor any trained professional that Roe met with and/or came in direct contact with immediately following the alleged assault and injury; and (iv) Roe's submittal of undated photographs which she claimed she took the morning after the assault, but which J.M. testified that she took *days* after the alleged assault, and which Plaintiff's expert witness expressly disclaimed.

c.   Siena found Plaintiff not to be credible, despite his acknowledged consistent version of events, based largely on gender stereotypes;

d.   Siena found Roe to be credible, despite her acknowledged shifting story, based on faulty "corroboration" from Roe's friends;

e.   Siena failed to properly apply the preponderance of the evidence standard, accepting Roe's unsupported claims over the objective evidence;

f.   Siena deliberately refused to question Roe's credibility or ignored Roe's clear lies, and presumed her to be credible from the start as the female accuser,

despite numerous demonstrable lies and inconsistencies in her claims;

g.  Siena's adjudicator relied on statements given to the Investigator by R.L., which R.L. deliberately requested be withdrawn;

h.  Siena failed to apply the presumption of innocence and presumed Plaintiff guilty from the start as a male accused;

i.  Siena's adjudicator distorted and skewed the record in favor of Jane Roe, and failed to acknowledge or note exculpatory evidence in favor of Plaintiff in her decision;

j.  Siena's adjudicator completely failed to acknowledge the doctor's declaration as well as medical records specifically refuting Roe's claimed injuries; and

k.  Siena failed to adequately and genuinely consider Plaintiff's appeal, instead rubber-stamping the decision.

219.  Particular circumstances suggest that gender bias was a motivating factor behind the flawed proceedings, erroneous findings, and/or the decision to impose unduly harsh discipline upon Plaintiff. These circumstances include, by way of example and not limitation:

a.  The federal pressure placed on Siena by virtue of hundreds of OCR investigations throughout the country, which put Siena at risk for losing federal funding;

b.  Years of pressure and criticism from the student body specifically geared towards Siena's perceived failure to protect females from sexual misconduct;

c.  Siena's blatant skewing of all facts and claims in favor of Jane Roe and her female witnesses, despite clear evidence of their lack of credibility;

d.  Siena's threat of a retaliation charge against Plaintiff if Plaintiff were to bring a counter-complaint against Roe, because Siena had purportedly never heard of a male bringing a sexual assault claim against a female;

e.  Siena's disparate treatment of similar circumstances as between Plaintiff, the male respondent, and Roe, the female accuser—for example, by claiming that Roe was credible despite her "evolving memory" because her shifting story was corroborated by her friends, while claiming that Plaintiff was not credible despite his consistent version of events that was supported by objective evidence, including videos, medical reports, and neutral testimony; and

f.  Siena's presumption that Roe was credible as a female complainant and Plaintiff was not credible as a male respondent, and/or its refusal to test or acknowledge the obvious problems with Roe's credibility.

220.    On information and belief, Siena's mishandling of Plaintiff's Title IX case was informed by institutional, systemic gender bias, as well as external pressure from the student body and the United States Department of Education, under a threat of recission of federal funds.

221.    Siena applied its policies and procedures in a manner that discriminated against John Doe on the basis of his sex and led to an erroneous outcome.

222.    Siena also imposed an unwarranted and unjustly severe sanction on John Doe, and gender bias was a motivating factor.

223.    Based on the foregoing, John Doe was subjected to a biased, prejudiced and unfair process in violation of Title IX designed to find him, the male, responsible for sexual assault and punish him severely for it.

224.    This unlawful discrimination in violation of Title IX proximately caused John Doe

to sustain substantial injury, damage, and loss, including, but not limited to: emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries, and other direct and consequential damages.

225.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Siena to: (i) reverse the outcome, findings, and sanction regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record with respect to the Roe complaint; (iii) remove any record of the finding or Plaintiff's expulsion from his educational file/disciplinary records/transcript; (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and (v) any and all further actions required to return Plaintiff to the status quo ante.

## AS AND FOR A SECOND CAUSE OF ACTION
### Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq*.
### (Selective Enforcement)

226.    Plaintiff John Doe repeats and realleges each and every allegation above as though fully set forth herein.

227.    Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et. seq., provides, in relevant part:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

228.    Title IX applies to all public and private educational institutions that receive federal funding, which includes Defendant Siena.

229.    In "selective enforcement" cases, a Plaintiff can challenge a university disciplinary outcome by asserting that regardless of the student's guilt or innocence, the severity of the penalty

and/or decision to initiate the proceeding was affected by the student's gender.

230.    For a selective enforcement claim, a male plaintiff "must demonstrate that a female was in circumstances sufficiently similar to his own and was treated more favorably by the University..." and that the "University's actions against [the male plaintiff] were motivated by his gender and that a similarly situated woman would not have been subjected to the same disciplinary proceedings." *Xiaolu Peter Yu v. Vassar Coll.,* 97 F. Supp. 3d 448, 480 (S.D.N.Y. 2015).

231.    In the instant matter, Siena subjected John Doe to disparate treatment in comparison to Jane Roe—a similarly situated female—and imposed a more severe sanction upon him.

232.    Doe and Roe were similarly situated because they were both alleged to have engaged in conduct which, if true, could have been in violation of Siena's Policy, specifically with regards to the issue of sexual assault. However, despite its knowledge of Roe's actions, which were potentially violative of Siena's Policy, the College failed to initiate proceedings against Roe, and only initiated proceedings against John Doe. As a result, Plaintiff was severely sanctioned, while Roe was not sanctioned at all.

233.    There are numerous circumstances demonstrating the College's partiality towards Roe as the female accuser, and against Doe as the male accused. These circumstances include, *inter alia*:

    a.    When Doe mentioned bringing a cross complaint against Roe for sexual assault, Goland scoffed at Plaintiff and threatened him with retaliation if he were to bring such a complaint, discouraging Plaintiff from bringing forth a formal complaint against Roe;

    b.    Years of pressure and criticism from the student body specifically geared towards Siena's perceived failure to protect females from sexual misconduct;

    c.    Upon information and belief, Siena's administration and leadership exercised pressure, ideological and otherwise, to find males responsible for accusations

of sexual misconduct, even where the evidence suggested otherwise;

    d.    The federal pressure placed on Siena by virtue of OCR investigations which put Siena at risk for losing federal funding, and one of which was, on information and belief, still pending during the pendency of Doe's disciplinary proceeding; and

    e.    The Hearing Officer ignored numerous inconsistencies in Roe's narrative in order to find her credible. By contrast, Doe's words were twisted and taken out of context at the hearing to support a finding that he was not credible. The disparate treatment of Roe and Doe is indicative of gender bias against Doe.

234.    Based on the foregoing, John Doe was subjected to a biased, prejudiced, and unfair process in violation of Title IX designed to find him, the male, responsible for sexual assault and punish him severely for it.

235.    This unlawful discrimination in violation of Title IX proximately caused John Doe to sustain substantial injury, damage, and loss, including, but not limited to: emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

236.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Siena to: (i) reverse the outcome, findings, and sanction regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record with respect to the Roe complaint; (iii) remove any record of the finding and/or Plaintiff's suspension from his educational file/disciplinary records/transcript; (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and (v) any and all further actions required to return Plaintiff to the status quo ante.

## AS AND FOR A THIRD CAUSE OF ACTION
### Breach of Contract

237.    Plaintiff John Doe repeats and realleges each and every allegation above as though

fully set forth herein.

238.    At all times relevant hereto, a contractual relationship existed between Siena and Plaintiff by virtue of Plaintiff's enrollment at Siena and as defined by and through Siena's policies and procedures governing and student disciplinary system, including but not limited to the Policy.

239.    Through the documents it publishes and provides to students, Siena makes express and implied contractual commitments to students involved in the disciplinary process and/or the investigation of potential violations of the Policy.

240.    New York law recognizes that the relationship between a student and a college is contractual in nature, and that the terms of the Student Handbook become part of that contract. *See Vought v. Teachers Coll., Columbia Univ.*, 511 N.Y.S.2d 880, 881 (2d Dep't 1987); *Xiaolu Peter Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 481 (S.D.N.Y. 2015).

241.    Implied in every contract is the covenant of good faith and fair dealing. *See Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88 (1917).

242.    Based on the aforementioned facts and circumstances, Siena created express and implied contracts when it offered, and Plaintiff accepted, admissions to Siena, and when Plaintiff paid the required tuition and fees.

243.    Siena breached its agreement(s) with Plaintiff throughout the course of its investigation and adjudication of Jane Roe's complaint. By way of example, and not limitation:

    a.    Siena failed to provide a process that was fair and impartial;

    b.    Siena failed to complete the investigation and adjudication within the time period prescribed by the Policy, and failed to provide Plaintiff appropriate written notice of the basis for such extensions as required under the Policy;

    c.    Siena failed to apply the presumption of innocence to Plaintiff;

    d.   Siena failed to properly apply the preponderance of the evidence standard;

    e.   Siena failed to follow its own definitions and guidelines for affirmative consent and incapacitation;

    f.   Siena failed to provide Plaintiff with adequate notice of the charges he was under investigation for; and

    g.   Siena failed to remove Gallagher from serving as Hearing Officer, despite clear bias and conflict of interest.

244.    Siena further breached the implied covenant of good faith and fair dealing, in that it applied its policies in a discriminatory way and was improperly motivated by gender bias, political expedience, and institutional self-interest in preserving/repairing Siena's reputation.

245.    Siena further violated the covenant of good faith and fair dealing by purporting to provide Plaintiff with a fair process, but in actuality endeavoring to find Plaintiff responsible and punish him to the utmost degree, regardless of the actual facts of the case.

246.    Siena further violated the covenant of good faith and fair dealing by skewing the facts and evidence in Roe's favor and deliberately ignoring, obfuscating, and discounting evidence which tended to show Plaintiff's innocence.

247.    As a proximate and foreseeable consequence of the foregoing breaches, Plaintiff sustained damages, including, but not limited to, emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

248.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**Violation of New York State Human Rights Law**

249.    Plaintiff John Doe repeats and realleges each and every allegation above as though fully set forth herein.

250.    Defendant Siena is an educational corporation and operating as such under the state laws of New York.

251.    The New York State Human Rights Law § 296(4) provides "[i]t shall be an unlawful discriminatory practice for an education corporation or association ... to permit the harassment of any student or applicant, by reason of his race, color, religion, disability, national origin, sexual orientation, military status, sex, age, or marital status[.]" N.Y. Exec. Law § 296(4).

252.    Siena's Sexual Misconduct and Interpersonal Violence Policy states, in pertinent part:

> Siena College proceedings that involve alleged violations of this policy will be conducted through a process that is prompt, equitable, fair, impartial, and provides adequate notice and a meaningful opportunity to be heard, as outlined below and in accordance with applicable law.

253.    Siena's Policy further states:

> Siena College has designated and authorized its Title IX Coordinator/Equal Opportunity Specialist (EOS) as the College employee who has primary responsibility for coordinating the College's efforts to comply with and carry out its responsibilities under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq., and related regulations issued by the U.S. Department of Education in May 2020, 34 C.F.R., Part 106 ("May 2020 Title IX regulations") to implement Title IX, which prohibit sex discrimination in all of the College's programs and activities, as well as retaliation for the purpose of interfering with any right or privilege secured by Title IX or the May 2020 Title IX regulations.

254.    Based on the foregoing, Siena permitted discrimination against Plaintiff on the basis of his sex.

255.    Based on the foregoing, Siena authorized, condoned, and/or acquiesced to

discriminatory conduct against Plaintiff.

256.   Based on the foregoing, Siena knew or should have known of such discriminatory conduct and failed to undertake action to prevent it.

257.   Defendant Siena engaged in the following discriminatory acts or practices against John Doe, as the male accused, including but not limited to: Siena subjected Plaintiff to disciplinary action in an arbitrary and capricious way, and in discrimination against him on the basis of his gender; Siena failed to adhere to its Policy; the decision of responsibility was discriminatory in that, given the evidence (or lack thereof), the only possible way to reach the decision was a discriminatory bias against males.

258.   Based on the foregoing facts and circumstances, Siena engaged in unlawful, discriminatory practices in violation of N.Y. Exec. Law § 296(4).

259.   As a direct and proximate consequence of the foregoing breaches, Plaintiff sustained damages, including, but not limited to, emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries, and other direct and consequential damages.

260.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.


**PRAYER FOR RELIEF**

**WHEREFORE,** for the foregoing reasons, Plaintiff John Doe demands judgment against Defendants as follows:

> (i)   On the first cause of action for violation of Title IX of the Education Amendments of 1972, a judgment awarding John Doe damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and

disbursements, as well as injunctive relief directing Siena to: (i) reverse the outcome, findings, and sanction regarding Roe's complaint; (ii) expunge Plaintiff's disciplinary record with respect to the Roe matter; (iii) remove any record of the Smith finding or Plaintiff's expulsion from his educational file/disciplinary records/transcript; (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and (v) any and all further actions required to return Plaintiff to the status quo ante;

(ii)    On the second cause of action for violation of Title IX of the Education Amendments of 1972 (selective enforcement), a judgment awarding John Doe damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Siena to: (i) reverse the outcome, findings, and sanction regarding Roe's complaint; (ii) expunge Plaintiff's disciplinary record with respect to the Roe matter; (iii) remove any record of the Roe finding or Plaintiff's suspension from his educational file/disciplinary records/transcript; (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and (v) any and all further actions required to return Plaintiff to the status quo ante;

(iii)    On the third cause of action for breach of contract, a judgment awarding John Doe damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; and

(iv)    On the fourth cause of action for New York State Human Rights Law § 296(4), a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements;

(v)    Such other and further relief as the Court deems just and proper.

## <u>JURY DEMAND</u>

John Doe herein demands a trial by jury of all triable issues in the present matter.


**Dated:** **New York, New York**
**October 27, 2022**


                            **Respectfully submitted,**

                            **NESENOFF & MILTENBERG, LLP**
                            *Attorneys for Plaintiff John Doe*

                            By: <u>/s/ *Stuart Bernstein*</u>
                            Stuart Bernstein, Esq.
                            Andrew T. Miltenberg, Esq.
                            Kristen Mohr, Esq., *pro hac vice*
                            *admission pending*
                            363 Seventh Avenue, Fifth Floor
                            New York, New York 10001
                            (212) 736-4500
                            sbernstein@nmllplaw.com
                            amiltenberg@nmllplaw.com
                            kmohr@nmllplaw.com

## <u>VERIFICATION</u>

**STATE OF** <u>New York</u>                  )

                                                                    ) ss.:

**COUNTY OF** <u>Albany</u>                  )

      **JOHN DOE**, being duly sworn, deposes and says:

      I am the Plaintiff named in this matter. I have read the annexed complaint, know the contents thereof, and the same are true to my knowledge, except as to matters alleged upon information and belief and as to those matters, I believe them to be true.

      Signed under the pains and penalties of perjury, on this <u>27</u> day of October, 2022.



**JOHN DOE**