**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

JOHN DOE,

                        Plaintiff,                    1:22-cv-1115 (BKS/TWD)

v.

SIENA COLLEGE,

                        Defendant.

_____

**Appearances:**

_For Plaintiff:_
Andrew T. Miltenberg
Tara J. Davis
Nesenoff & Miltenberg, LLP
363 Seventh Avenue, Fifth Floor
New York, NY 10001

_For Defendant:_
Suzanne M. Messer
Liza R. Magley
Bond Schoeneck & King, PLLC
One Lincoln Center
Syracuse, NY 13202

**Hon. Brenda K. Sannes, Chief United States District Judge:**

### MEMORANDUM-DECISION AND ORDER

## I.     INTRODUCTION

On October 27, 2022, Plaintiff John Doe, a student at Defendant Siena College, filed this action alleging violations of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. ("Title IX"); breach of contract; and violation of New York State Human Rights Law ("NYSHRL") § 296(4). (Dkt. No. 1, ¶¶ 209–60). The same day, Plaintiff filed a motion under Federal Rule of Civil Procedure 65 for a temporary restraining order ("TRO") and preliminary

injunction "enjoining Defendant from enforcing Siena's October 25, 2022 final decision suspending Plaintiff from Siena for two years and placing a notation on his transcript, and directing Defendant to immediately restore Plaintiff's access to all courses and academic resources necessary for the completion of his undergraduate studies, and, upon successful completion of his degree requirements, to timely confer Plaintiff's degree." (Dkt. No. 2-6, at 6). On October 31, 2022, the Court held a video teleconference with the parties, who advised that they had reached an agreement to hold in abeyance Plaintiff's suspension, subject to certain conditions, until a decision on the motion for a preliminary injunction, thereby mooting the motion for a TRO. Plaintiff's motion for a preliminary injunction is now fully briefed, (Dkt. Nos. 17, 21, 22), and the Court held an evidentiary hearing on December 16, 2022. Having carefully considered all of the parties' submissions and the evidence and argument at the hearing, the Court grants Plaintiff's motion for a preliminary injunction. The following constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a).

## II.   BACKGROUND[1]

Plaintiff is a student at Siena College with an expected graduation date of May 2023. (Dkt. No. 1, ¶ 45). He is a member of Siena College's Army Reserve Officers' Training Corps ("ROTC") and has signed a contract to serve as Second Lieutenant with the United States Army following his graduation. (*Id.* ¶ 45; Dkt. No. 2-1, ¶ 10). Jane Roe, a student at Siena College with an expected graduation date of May 2025, (Dkt. No. 1, ¶ 46), filed a Title IX complaint at Siena College alleging sexual misconduct against Plaintiff in February 2022. This action arises out of

---

[1] The facts are drawn from the verified complaint as well as the evidence presented at the evidentiary hearing and the declarations and exhibits submitted by both parties in connection with Plaintiff's motion. (Dkt. Nos. 1, 2, 17, 22).

Defendant's decision finding Plaintiff responsible for sexual misconduct and imposing a sanction consisting of a two-year suspension and a notation on Plaintiff's transcript indicating that he was suspended after being found responsible for a code of conduct violation.

    **A.**    **Federal Guidance and Pressure on Defendant Regarding Sexual Misconduct**

        **1.**    **Federal Guidance**

On April 14, 2011, the Department of Education's Office for Civil Rights ("OCR") issued a guidance letter, known as the "April 2011 Dear Colleague Letter," to colleges and universities receiving federal funding. (*Id.* ¶ 13). The Dear Colleague Letter "minimized due process protections" for individuals accused of sexual misconduct by, for example, mandating the adoption of a "more likely than not" burden of proof. (*Id.* ¶ 15). The OCR issued additional directives in April 2014. (*Id.* ¶¶ 17–18). That same month, the White House issued a report called "Not Alone," which "included a warning that if the OCR finds a school in violation of Title IX, the 'school risks losing federal funds.'" (*Id.* ¶ 19). The OCR "has conducted over five hundred investigations of colleges for the potential mishandling of complaints of sexual misconduct." (*Id.* ¶ 20). While Siena College has not been the subject of an investigation, (Dkt. No. 17-7, ¶ 22; Dkt. No. 17-12, ¶ 82), Plaintiff alleges that "[c]olleges and universities, including Siena, were fearful of and concerned about being investigated or sanctioned by the [Department of Education] and/or of potential Title IX lawsuits by the [Department of Justice]," (Dkt. No. 1, ¶ 21). Such higher education institutions therefore "have limited procedural protections afforded to males . . . in sexual misconduct cases." (*Id.*).

On September 22, 2017, the OCR rescinded the Dear Colleague Letter and issued interim guidance regarding the adjudication of sexual misconduct complaints. (*Id.* ¶ 22). The Office noted that it had placed "improper pressure . . . to adopt procedures that do not afford fundamental fairness" and which are not required by Title IX. (*Id.* ¶ 23). Plaintiff alleges, on

information and belief, that Defendant did not change its Title IX policy or procedures in response to the rescission of the Dear Colleague Letter. (*Id.* ¶ 25). The Department of Education issued new Title IX regulations in May 2020, which provide respondents with procedural rights such as the right to a meaningful live hearing. (*Id.* ¶ 28). Lois Goland, Defendant's Title IX Coordinator, expressed her lack of support for this new Title IX rule because the opportunity for cross-examination might deter individuals from coming forward with complaints. (*Id.* ¶ 29 (citing Rick Karlin, "Revised assault rules debated," WRAL News (Nov. 20, 2018), https://www.wral.com/revised-assault-rules-debated/18009250/)).

### 2.    Pressure on Defendant

Plaintiff alleges that Defendant "has faced student pressure regarding its failure to adequately address sexual misconduct complaints made against male students and faculty." (*Id.* ¶ 37). In 2016, for example, a female student sued Defendant for negligently failing to patrol residence areas, thereby "allowing a male to viciously rape her." (*Id.* ¶ 38). In 2018, Ms. Goland, Title IX Associate Danielle Joyce, Siena students, and the College's "marketing team" collaborated to create a "NO MORE" campaign on the "issue of campus sexual assault." NO MORE, "How One College Created a Student-Driven NO MORE Campaign for Sexual Assault Awareness Month," (May 9, 2018), https://nomore.org/siena-college-says-no-more/. The campaign included the creation of a thirty-second video featuring students "saying NO MORE to sexual assault." (Dkt. No. 1, ¶ 39). The majority of the lines in this video reference "a female victim and a male perpetrator." (*Id.*). Ms. Joyce asserts, however, that the campaign was not "gender-driven." (Dkt. No. 17-7, ¶ 19). Finally, Plaintiff alleges, as an example of student pressure on Defendant, a female student's 2021 article "pondering" what the College had done to make students feel safe and secure in the face of multiple reported sexual assaults. (Dkt. No. 1, ¶ 41).

In response, Defendant asserts that there is "no statistical support" for the allegation that pressure on the College "has resulted in bias against males." (Dkt. No. 17-7, ¶ 23). Between 2018 and 2022, Defendant received sixteen formal complaints of sexual misconduct that "went through the adjudication process." (*Id.*; *see* Dkt. No. 17-11 (table containing data regarding these 16 complaints)). Nine of these complaints involved allegations of sexual assault, and two of those male respondents were found responsible while seven were found not responsible. (Dkt. No. 17-7, ¶ 23). One complaint, which involved allegations of dating violence, involved a male complainant and a female respondent, and the female respondent was found responsible. (*Id.* ¶ 24).

### B.   February 12–13, 2022 Incident Between Plaintiff and Roe[2]

On the evening of February 12, 2022, Plaintiff was spending time with his friends on campus and "casually drinking." (Dkt. No. 1, ¶¶ 47–48). At approximately 12:10 a.m. on the morning of February 13, Plaintiff and some of his friends began walking towards an off-campus party and, on the way, met Roe and two of her friends, R.L. and J.M. (*Id.* ¶¶ 49–50).[3] Plaintiff's friend invited the three women back to their dorm, and Plaintiff "had no direct interaction with Roe until returning back to the dorm building." (*Id.* ¶ 51). According to Plaintiff, none of the women "appeared intoxicated at this time" and all were "walking steadily" and "able to navigate the icy and snowy walkways." (*Id.* ¶ 52).[4] Back at the dorm, the group entered the room of

---

[2] Plaintiff's version of the incident, which largely tracks his account during the Title IX proceedings, is taken from the verified complaint. Roe's and other witnesses' accounts of the incident are taken from the portion of the Title IX record which is before the Court.

[3] Plaintiff and Roe did not know each other prior to the night in question. (Dkt. No. 17-2, at 6).

[4] Prior to meeting up with Plaintiff and his friends, Roe and her friends had "pregamed" and briefly attended another party. (*See* Dkt. No. 17-2, at 6). In light of the hearing officer's determination that there was insufficient evidence to find that Roe was incapacitated by reason of intoxication and in the interest of brevity, the Court largely omits facts regarding the parties' states of intoxication.

student A.J. (*Id.* ¶ 53). Plaintiff asserts that he did not see Roe, R.L., or J.M. consume any

alcohol while in A.J.'s room. (*Id.* ¶ 54).

### 1.     Meeting in A.J.'s Room

According to Plaintiff, Roe began talking to several of Plaintiff's male friends, and then

approached a female friend, S.G., and asked for S.G.'s opinion of the men in the room. (*Id.* ¶ 55).

Roe told S.G. that she was "not looking for a relationship, and that she was only looking for

sex." (*Id.* ¶ 56). S.G. told Roe that Plaintiff was also "not looking for a relationship at the time."

(*Id.* ¶ 57; *see also* Dkt. No. 17-18, at 11 (S.G. told investigator that Roe asked what S.G.

"thought of" Plaintiff and that S.G. told Roe that "he was a good guy and a friend, but that he

was not interested in a relationship"); Dkt. No. 17-18, at 13 (Plaintiff's roommate T.R. overhead

S.G. tell Roe that Plaintiff "was not interested in a relationship")). Roe, on the other hand, told

the investigator that she remembered "being warned by [S.G.] to stay away from two guys in the

room—one of them being [Plaintiff]," and that she was unable to "fully process" this warning

due to her alcohol consumption. (Dkt. No. 17-18, at 11).[5] While Plaintiff and Roe both state that

they left for Plaintiff's room together consensually, (Dkt. No. 17-18, at 13), they provided very

different versions of the events that occurred after Roe's conversation with S.G.

### 2.     Plaintiff's Version of the Incident

According to Plaintiff, Roe approached Plaintiff and asked him "where his room was

located," and Plaintiff responded with his room number. (Dkt. No. 1, ¶ 58). Roe "grabbed

Plaintiff's hand" and "led [him] towards his room," which was "two doors down the hallway."

(*Id.* ¶¶ 58–59). According to Plaintiff, once in Plaintiff's room, Roe began to kiss him "without

first obtaining consent." (*Id.* ¶ 62). Plaintiff was "startled" and "moved backwards to sit at his

---

[5] At the hearing, Roe stated that R.L. and J.M. "were present and should have also heard" S.G.'s warning, but neither R.L. nor J.M. recalled such a warning. (Dkt. No. 17-2, at 7, 9).

desk chair." (*Id.* ¶ 63). Roe asked which bed was Plaintiff's and "jumped onto Plaintiff's bed on

her own," and Plaintiff followed. (*Id.* ¶ 64). Roe then "climbed on top of Plaintiff to straddle

him, and started kissing Plaintiff" and "removing her own shirt." (*Id.* ¶ 65).

According to Plaintiff, one of his roommates, C.M., and C.M.'s girlfriend S.O., were still

in the room at this point. Before noticing C.M.'s and S.O.'s presence, Roe told Plaintiff that "she

did not want a relationship and was 'just there for sex.'" (*Id.* ¶¶ 66–67). C.M. and S.O. both told

the investigator that they were in the room when Plaintiff and Roe entered. (Dkt. No. 17-2, at

13). S.O. stated that she heard Roe say: "I don't want a relationship. I'm here for the sex." (*Id.*).

S.O. stated that Plaintiff responded with "Perfect" and that Roe "said something like, 'You are

my first or second male body'" before the two "began to 'make out aggressively.'" (*Id.*). C.M.

told the investigator that Roe "made it clear that she was just there for sex and wanted nothing to

do with a relationship" and that he witnessed Plaintiff and Roe kissing before leaving the room.

(*Id.*). According to Plaintiff, C.M., and S.O., Roe noticed the presence of C.M. and S.O., who left

the room. (*Id.*; Dkt. No. 1, ¶¶ 68–69).[6]

According to Plaintiff, Roe fully removed her shirt, "got back on top of Plaintiff in a

straddling position," and kissed Plaintiff "aggressively." (*Id.* ¶ 70). Roe then unbuttoned

Plaintiff's pants "without Plaintiff's consent"[7] and "began performing oral sex on Plaintiff," who

"did not say one word." (*Id.* ¶ 71). Roe "began to unbutton her own pants," then "grabbed

Plaintiff's hand and guided it toward [Roe's] genital area." (*Id.* ¶ 73). Plaintiff inserted his finger

into Roe's vagina. (*Id.*).

---

[6] Roe testified at the Title IX hearing that she did not recall anyone else being in the room or making any of the
statements attributed to her. (Dkt. No. 17-25, at 24–26). Although the Court refers to "testimony" given at the Title
IX hearing, the Court notes that the witnesses were not under oath. (*See, e.g.*, *id.* at 9 ("Please note that everyone
present today is expected to present true and honest information.")).

[7] At the evidentiary hearing, Plaintiff testified that this occurred without his "explicit, verbal consent."

After a few minutes, Roe asked Plaintiff if he had a condom. (*Id.* ¶ 74). Plaintiff responded that he did and got off the bed to retrieve it before returning to the bed and laying down. (*Id.* ¶¶ 74–75). Roe "again climbed on top of Plaintiff" and, "without any assistance," "inserted Plaintiff's penis into her vagina and began to move up and down while Plaintiff laid on his bed." (*Id.* ¶ 76). After a few seconds, Plaintiff's roommate T.R. entered the room, saw Plaintiff and Roe, and quickly left. (*Id.* ¶ 77).[8] T.R. testified at the hearing that he entered the room at some point while Plaintiff and Roe were "on the bed and 'intimate'" and that he "observed [Roe] on top of [Plaintiff]." (Dkt. No. 17-2, at 13). According to Plaintiff, Roe, who is "both taller and heavier than Plaintiff," then "leaned her entire bodyweight on Plaintiff to kiss him aggressively." (Dkt. No. 1, ¶ 78). Plaintiff was "unable to breathe" and "repulsed" by Roe's bad breath, and he "placed his hands on Roe's collarbone area to gently push her off of him" while exclaiming "you're crushing me." (*Id.* ¶¶ 78–80). Roe "began to tear up" and asked what Plaintiff was doing. (*Id.* ¶ 81). Roe put on Plaintiff's t-shirt and left the room crying at approximately 1:20 a.m. (*Id.* ¶ 83).

### 3.      Roe's Version of the Incident

Roe's account of what transpired in Plaintiff's dorm room is quite different from Plaintiff's. According to Roe, she and Plaintiff were kissing consensually; she remembers being on Plaintiff's bed but not the act of getting on it. (Dkt. No. 17-2, at 10). Roe began to feel uncomfortable when she realized Plaintiff was undressed. (Dkt. No. 17-18, at 14). She told the investigator that she tried to "slow down" Plaintiff's advances by saying things like "Whoa" and "slow down," which caused Plaintiff to back off only "momentarily." (*Id.*). When Roe told

---

[8] Roe did not recall T.R. entering the room and stated that she was "pretty sure that that didn't happen." (Dkt. No. 17-25, at 34).

Plaintiff he was hurting her, Plaintiff responded: "What? You don't like it rough?" (Dkt. No. 17-2, at 10). At the hearing, Roe stated that Plaintiff "started to bite, grab, and scratch her as well as pull her hair" and that he bit her lip "over and over again." (*Id.*). According to Roe, Plaintiff "forced his penis down her throat." (Dkt. No. 17-18, at 14). He then "choked [Roe] around the neck until 'her consciousness faded.'" (*Id.* at 15). Roe recalls that she lost consciousness and then was "in and out"; when she regained full consciousness and began moving again, Plaintiff "slammed [her] head into the side wall." (*Id.*). Roe also recalls that at one point Plaintiff was "penetrating her, 'viciously'" and has a "hazy but unclear recollection of [Plaintiff] having his mouth on her vagina." (*Id.*). Afterward, Roe recalls Plaintiff leaving the room first; she left alone shortly thereafter. (*Id.*).

### 4.    Plaintiff's Actions After the Incident

According to Plaintiff, after Roe left his dorm room, he "sat in his bed for a few minutes . . . processing what had just happened." (Dkt. No. 1, ¶ 89). He then got dressed and went back to A.J.'s room. (*Id.*). A few minutes later, Roe's friend R.L. messaged Plaintiff on Snapchat and asked: "why would you do that?" and "what is wrong with you?" (*Id.* ¶ 90). Plaintiff was "confused" by these messages and showed them to S.G., asking "what do I say? I didn't do anything." (*Id.* ¶ 91). S.G. advised Plaintiff not to answer the messages. (*Id.*). Plaintiff "felt taken advantage of" and attempted to sleep, "but woke up feeling mortified that he had been taken advantage of by Roe." (*Id.* ¶¶ 92–93). Plaintiff asserts that he has become "disassociated with the campus community" since the incident and has felt "uncomfortable" around campus. (*Id.* ¶¶ 94–95).

### 5.    Roe's Actions After the Incident

Surveillance video footage captured Roe leaving Plaintiff's dorm building around 1:20 a.m. (Dkt. No. 17-18, at 17). The video footage shows Roe "with no noticeable injuries." (Dkt.

No. 1, ¶ 84).[9] As Roe approached another dorm building, she encountered her friend N.K. and N.K.'s boyfriend, R.P. (*Id.* ¶ 85; Dkt. No. 17-18, at 17). Roe did not tell N.K. or R.P. anything regarding an assault, and R.P. told the investigator that he did not notice any injuries on Roe. (Dkt. No. 17-18, at 17; *see also* Dkt. No. 1, ¶ 85). N.K., however, testified that she "noticed that [Roe] had a fat lip and was bleeding," and had a mark on her neck. (Dkt. No. 17-18, at 17; Dkt. No. 17-25, at 289). N.K. let Roe into the dorm building, and Roe subsequently entered J.M.'s room, where J.M.'s roommate, G.M., was present. (Dkt. No. 1, ¶¶ 85–86). G.M. did not notice any specific injuries on Roe. (*Id.* ¶ 87; *see also* Dkt. No. 17-18, at 18).[10] Roe told G.M.: "I think I got raped." (Dkt. No. 17-18, at 18). R.L. and J.M. later arrived at the room, and Roe also told them she had been raped. (*Id.*; Dkt. No. 1, ¶ 88). R.L. noted that Roe's lip was "completely destroyed." (Dkt. No. 17-18, at 18). R.L. and J.M. returned Roe to her own dorm room. (*Id.*). Surveillance video footage shows J.M. and Roe calmly passing a security guard who makes eye contact with Roe but does not approach her or offer assistance. (Dkt. No. 1, ¶¶ 137–39, 143(d)).

According to Roe, when she awoke later in the morning of February 13, she saw marks on her neck and that her lip was swollen. (Dkt. No. 17-18, at 18). Roe told the investigator that she "photographed her various bruises and her lip area" before walking to J.M.'s dorm. (*Id.*). At the hearing, however, Roe stated that the photographs of her alleged injuries were taken over the course of various days and that she recalled asking J.M. "to photograph bruises on her body."

---

[9] The surveillance video footage, as well as Roe's medical records, the photographs of Roe's alleged injuries, and the February 13 incident report, are not in the record before the Court. Because of restrictions put in place by Defendant, Plaintiff is unable to "copy, paste, export, save, or print any of the documents or videos" shared with him as part of the Title IX record. (Dkt. No. 2-1, ¶ 18; *see also* Dkt. No. 21, at 10 & n.3 (noting that "Siena's public safety reports and [Roe's] medical records" are "in the exclusive control" of Defendant)). Defendant did not produce these parts of the Title IX record and does not contradict Plaintiff's assertions of what these pieces of evidence show. The Court has therefore accepted Plaintiff's representations as true for the purpose of this decision.

[10] At the hearing, G.M. testified that she and Roe were on separate beds which were approximately two feet apart. (Dkt. No. 17-25, at 316–17). G.M. further testified that Roe spent the night of February 13–14 on the floor of J.M. and G.M.'s room, and that she did not observe any injuries to Roe at that time either. (*Id.* at 321).

(Dkt. No. 17-2, at 14). J.M. testified that Roe "asked her to take photos of the bruises on her body" but could not recall "what day specifically." (*See id.* at 16). On the morning of February 13, Roe told J.M. and R.L. that Plaintiff "got rough" and "at some point had 'knocked her out' by hitting her head against a wall." (Dkt. No. 17-18, at 19). J.M. stated that Roe was "bruised in several areas" and that her lip was "really cut up." (*Id.*).

Roe and J.M. reported the incident to Defendant's Department of Public Safety ("DPS") at 3:48 p.m. on February 13. (*Id.*). Roe "never mentioned the lip injury" to the public safety officer she spoke with, and the officer "did not document any such injury." (Dkt. No. 1, ¶¶ 98, 143(e)).[11] Roe also met with Siena's Director of Community Learning, James Calechman, and Mr. Calechman's report makes no mention of a lip injury. (*Id.* ¶ 143(f)).

### 6.      Roe's Medical Records

On the afternoon of February 13, Roe and J.M. went to the hospital to have a sexual assault nurse examiner ("SANE") examination performed. (Dkt. No. 17-18, at 19). Roe reported to the examining clinician that Plaintiff had "asked her to give him head multiple times in which she declined each time" and that Plaintiff was "very forceful" and "strangulated" her, causing her to pass out. (*Id.*). Roe reported that "after the event she noticed some bruising on her hips, a bruised and bleeding lower lip from him biting her lip, and a red mark in the middle of the chest." (*Id.*). She did not report that Plaintiff had slammed her head into the wall. (*Id.*). The physical examination revealed a "1-cm red mark in the center of [Roe's] chest." (*Id.* at 20). There was "no bruising appreciated" in the neck area, and the examination was otherwise unremarkable. (*Id.*). Roe returned to the hospital on February 14, reporting additional symptoms

---

[11] The record reflects that DPS's incident report was part of the Title IX record. (*See* Dkt. No. 17-18, at 5, 19). In light of the fact that this report is in Defendant's possession and unable to be produced by Plaintiff, *see supra* note 9, the Court accepts the facts in the verified complaint regarding Roe's failure to mention the lip injury to DPS and the report's failure to document any lip injury as true for purposes of this motion.

such as a headache and chest pain. (*Id.*). The physical examination results were "similar" to those reported the day before, except that Roe's neck was "[t]ender to palpitation over trachea anterior neck bilaterally over carotids. No bruising appreciated." (*Id.*).[12]

### C.    Title IX Complaint

Defendant's Department of Public Safety conveyed Roe's report of sexual assault to Defendant's Title IX office, which "contacted and spoke with Jane Roe on February 14, 2022." (Dkt. No. 17-12, ¶ 6). Public Safety Officer Brian Hogan and Ms. Joyce met with Roe "to discuss her report." (Dkt. No. 17-7, ¶ 4). No-contact orders "directing both Roe and Doe not to communicate with each other" were issued the next day, February 15. (*Id.*).

On February 24, 2022, Roe filed a formal Title IX complaint alleging sexual misconduct against Plaintiff with the Title IX office. (Dkt. No. 1, ¶ 102; Dkt. No. 17-12, ¶ 7). That same day, the Title IX office sent Plaintiff a notice of investigation. (Dkt. No. 2-3). This notice informed Plaintiff that Roe had filed a formal complaint accusing Plaintiff of violating the Siena College Sexual Misconduct and Interpersonal Violence Policy (the "Policy"). (*Id.* at 2).[13] The notice read:

> According to the formal complaint, you engaged in the following conduct that potentially constitutes sexual harassment under the Title IX Grievance Process:
>
> Section IV. Title IX Sexual Assault, specifically rape;
>
> - The carnal knowledge of a person (i.e., penile-vaginal penetration), without the consent of that person

---

[12] While Roe provided excerpts of her medical records from February 13 and 14 to the investigator, the Title IX record does not include the SANE report. (*See* Dkt. No. 17-2, at 14).

[13] The 2021–2022 academic year Policy is available at Dkt. No. 17-13. With his motion for a preliminary injunction, Plaintiff submitted a version of the policy which was last modified in June 2022, after the Title IX complaint at issue was filed. (Dkt. No. 2-2). The subsequently filed declaration of Attorney Bernstein (Dkt. No. 22) cites to the 2021–2022 Policy provided by Defendant, and the Court does the same in this decision. The parties have not identified any differences between the two policy versions that would be material to the Court's decision.

- Oral sex with another person without the consent of that person

Section IV. Title IX Severe, Pervasive and Objectively Offensive Sexual Harassment; specifically choking.

Specifically, Reporting Party alleges that a little after midnight on February 13, 2022, Respondent engaged in non-consensual sexual intercourse and oral sex with Reporting Party in a dorm room . . . . Reporting Party further alleges that Respondent engaged in severe and pervasive sexual harassment when he used force and choked her while engaging in non-consensual sexual intercourse. Reporting Party further alleges she was incapacitated and therefore incapable of consent due to alcohol.

(*Id.*). Ms. Goland appointed Thomas D'Antonio of the law firm Ward Greenberg Heller & Reidy

LLP to investigate Roe's allegations. (*Id.* at 3; Dkt. No. 17-12, ¶ 36).

### D.     Title IX Investigation and Procedural History

### 1.     Initial Meeting and Possibility of Cross-Complaint

Plaintiff and his advisor, attorney Stuart Bernstein, met with Ms. Goland and Ms. Joyce

on March 3, 2022 via Zoom "to discuss the Notice and the investigation and hearing processes

set forth in the Policy." (Dkt. No. 17-12, ¶ 38; Dkt. No. 1, ¶ 108; Dkt. No. 22-1 (calendar

invitation for meeting on March 3, 2022 from 1:00 p.m. to 1:45 p.m.)). At this meeting, which

was the subject of the evidentiary hearing before the Court, Plaintiff's advisor "mentioned that

Plaintiff wanted to file a cross-complaint for sexual assault against Roe, given that Roe initiated

all sexual contact without Plaintiff's consent." (Dkt. No. 1, ¶ 109; Dkt. No. 17-12, ¶ 39 (Goland

declaration stating that Attorney Bernstein "raised the possibility of filing a complaint against

Jane Roe")). Attorney Bernstein testified that Ms. Goland's response to his bringing up the

possibility of filing a complaint against Roe was to state "[Plaintiff] was assaulted" in an

incredulous and dismissive manner. He testified that Ms. Goland indicated that, if Plaintiff

brought a complaint against Roe, it could result in a complaint for retaliation on Plaintiff's part.

In a contemporaneous email to his law firm colleagues dated March 3, 2022 at 2:00 p.m.,

Attorney Bernstein wrote: "Title IX Coordinator, Lois Goland, didn't know what hit her when I brought up filing a complaint against the girl. She seemed to still be in the stone age that [Plaintiff] 'was assaulted'. She threw out retaliation and I said I welcomed Siena to file it." (Dkt. No. 22-2, at 2; *see* Dkt. No. 22, ¶¶ 8–10).

Plaintiff testified at the evidentiary hearing that, apart from greeting or saying goodbye to Ms. Goland and Ms. Joyce, he did not say anything at the March 3 meeting. He testified that the meeting started out as informational, but that when Attorney Bernstein inquired as to how the College would proceed if Plaintiff were to file a complaint against Roe, Ms. Goland seemed shocked or taken aback and asked in a dismissive manner if Plaintiff had been assaulted. (*See also* Dkt. No. 1, ¶ 110 (alleging that Ms. Goland "scoffed" at the mention of a cross-complaint for sexual assault "made by a male against a female" and "threatened Plaintiff with retaliation if Plaintiff were to bring such a complaint")). Plaintiff testified that Ms. Goland suggested that it would be redundant for him to file a complaint, as the investigator would review all of the information relating to the incident in any event. Plaintiff testified that he felt "fearful" and as though the deck were stacked against him, and he had the impression that Ms. Goland had already made up her mind that he was responsible for the allegations against him.

Ms. Goland also testified at the evidentiary hearing. She stated that the March 3 meeting was informational and intended to provide Plaintiff with an overview of the Title IX policies and procedures. Ms. Goland testified that, when Attorney Bernstein raised the possibility of Plaintiff's filing a cross-complaint, she said that it was Plaintiff's right to do so, and that any cross-complaint would be investigated along with Roe's complaint by the same investigator. (*See also* Dkt. No. 17-12, ¶ 39). Ms. Goland also testified that she informed Plaintiff and Attorney Bernstein that it was possible that Roe could view a cross-complaint as retaliatory because it

came shortly after Roe filed her complaint against Plaintiff. (*See also id.*). According to Ms. Goland, the Title IX office at Siena had not received a cross-complaint before. She also testified that any claim of retaliation would be investigated and adjudicated through the College's Office of Student Life, not through the Title IX office. Ms. Goland denied scoffing at the mention of a potential cross-complaint and denied threatening Plaintiff with retaliation. Ms. Joyce similarly testified that, in response to Attorney Bernstein's inquiry, Ms. Goland informed Plaintiff that it was his right to file a cross-complaint but also wanted to make him aware of the possibility that Roe might view it as retaliatory. Ms. Joyce testified that Ms. Goland's statements in this regard aligned with her understanding of the Policy. (*See also* Dkt. No. 17-7, ¶¶ 7–8).

Based on the testimony at the evidentiary hearing, the Court finds that Ms. Goland did not threaten Plaintiff with retaliation if he were to file a complaint against Roe at the March 3 meeting. All four individuals who were present at the meeting agree that Ms. Goland raised the possibility that a cross-complaint might be viewed as retaliatory, but Ms. Goland and Ms. Joyce testified credibly that Plaintiff was not in fact threatened with retaliation. The Court, however, finds that Ms. Goland stated that "[Plaintiff] was assaulted" in a dismissive and incredulous manner, as Attorney Bernstein and Plaintiff both testified. This testimony is corroborated by Attorney Bernstein's contemporaneous email to his colleagues reporting the same.[14] Finally, the

---

[14] During questioning at the evidentiary hearing, Ms. Goland was reluctant to admit that the allegation in the complaint that Roe performed oral sex without Plaintiff's consent would violate the Policy. (*See* Dkt. No. 1, ¶ 71 (complaint alleging that "Roe unbuttoned Plaintiff's pants, again without Plaintiff's consent, and began performing oral sex on [him]. Plaintiff did not say one word."); *see also* Dkt. No. 17-13, at 5 (Policy providing that "[s]ilence or lack of resistance, in and of itself, does not demonstrate consent")). Ms. Goland first testified that this allegation was not a "per se" violation and then testified that it would, "on its face," violate the Policy. Having observed and considered Ms. Goland's testimony, the Court finds that it further corroborates the testimony of Plaintiff and Attorney Bernstein that Ms. Goland asked, in an incredulous way, whether Plaintiff had been assaulted.

Court finds Plaintiff's testimony credible that, at this meeting, he felt the deck was stacked against him.[15]

A few days after the March 3 meeting, Plaintiff contacted Ms. Joyce about moving forward with filing a complaint against Roe, and a meeting was scheduled for March 11, 2022. (Dkt. No. 17-7, ¶¶ 9–10; *see* Dkt. Nos. 17-8, 17-9). On March 10, Plaintiff wrote to Ms. Joyce: "Due to some unsettling incidents that I experienced this past week, I would like to postpone our meeting scheduled for tomorrow." (Dkt. No. 17-10, at 2). Ms. Joyce acknowledged Plaintiff's email and told Plaintiff that they would reschedule the meeting. (*Id.*). After she did not hear back from Plaintiff or his advisor, Ms. Joyce followed up with Plaintiff on March 21 regarding his intent to file a complaint against Roe. (Dkt. No. 17-7, ¶ 14). Plaintiff responded the next day, stating that he was "still discussing with [his] family and advisors" about whether to file a complaint against Roe. (Ex. D-007). Plaintiff wrote that he was "hesitant based upon [his] fear [Roe] could somehow use this to claim retaliation," noting that this was "something Ms. Goland said was a possibility during our informational meeting." (*Id.*). Ms. Joyce states that Plaintiff did not thereafter contact her regarding a cross-complaint. (Dkt. No. 17-7, ¶ 16). Plaintiff asserts that Ms. Goland's "aggressive response caused [him] to forego filing a cross-complaint." (Dkt. No. 1, ¶ 111).

### 2. Mr. D'Antonio's Investigation

Mr. D'Antonio began his investigation into Roe's allegations on March 9, 2022. (Dkt. No. 17-18, at 3).[16] Mr. D'Antonio interviewed seven witnesses before interviewing Plaintiff. (*Id.*

---

[15] The Court's factual findings at this stage "are not binding in subsequent proceedings before the Court." *Dep't of Health & Human Servs. v. RxUSA Wholesale, Inc.*, 285 F. App'x 809, 810 (2d Cir. 2008) (summary order) (citation omitted).

[16] Although Plaintiff asserts that he was "informed" that Mr. D'Antonio had been employed to conduct the Title IX investigation on May 6, 2022, (Dkt. No. 1, ¶ 113), the February 24 notice of investigation indicates that Mr. D'Antonio would be the investigator, (Dkt. No. 2-3, at 3). However, the College's May 6 communication with Plaintiff was the

at 4; Dkt. No. 1, ¶¶ 114–15). Plaintiff was not interviewed until May 25, 2022, over three months

after the incident. (Dkt. No. 1, ¶ 116). At that time Plaintiff informed Mr. D'Antonio that "he

would be away fulfilling his Siena ROTC obligations for the month of July." (*Id.* ¶ 118). On

June 13, 2022, Ms. Joyce informed Attorney Bernstein that Mr. D'Antonio's preliminary

investigative report "should be available by the end of the month." (Dkt. No. 22-5, at 3). In a

reply email dated July 6, Attorney Bernstein "confirm[ed]" with Defendant that Plaintiff would

be unavailable to review the report until August 9 due to his ROTC obligations. (*Id.* at 2). On

July 7, 2022, Ms. Joyce granted Plaintiff and Roe access to the preliminary investigative report.

(*See* Dkt. No. 17-15 (email correspondence)). Because the Title IX office had been advised that

Plaintiff was "on military assignment until August 8," it extended the time to respond to the

report until August 12, 2022 for both parties. (*Id.* at 2).

Both Plaintiff and Roe submitted responses to the preliminary investigative report,

seeking to have certain evidence added to or removed from the record. (Dkt. Nos. 17-16, 17-17).

Plaintiff asserts that the preliminary investigative report contains only "summaries" of Mr.

D'Antonio's interviews with the parties and witnesses and that the "full transcripts and/or

recordings of the interviews were never produced to Plaintiff," leaving Plaintiff with "no way of

comparing the summaries with the full interview notes to determine what had been excluded or

altered." (Dkt. No. 1, ¶ 119). Mr. D'Antonio issued his final investigative report on August 22,

2022, (Dkt. No. 17-18), and Plaintiff submitted a response, (Dkt. No. 17-19).

---

"first contact Plaintiff received from Siena after the initial meeting" on March 3. (Dkt. No. 1, ¶ 113; *see also* Dkt. No.
17-5, at 50 (email dated May 6, 2022 from Ms. Joyce to Plaintiff asking for his availability "after May 11, 2022" to
speak with Mr. D'Antonio)).

### 3.    Affirmation of Andrew Mastanduono, M.D.

Plaintiff submitted to the investigator the affirmation of Andrew J. Mastanduono, M.D., which became part of the Title IX record. (*See* Dkt. No. 17-18, at 23; Dkt. No. 2-4 (Mastanduono affirmation)). Dr. Mastanduono is a physician who is board certified in emergency medicine; he is the Associate Residency Program Director for Emergency Medicine at South Shore University Hospital, and is actively engaged in the clinical practice of emergency medicine. (Dkt. No. 2-4, ¶ 1). After reviewing Defendant's investigation "Evidence Binder" as well as security video footage, Dr. Mastanduono opined, within a reasonable degree of medical certainty, that Roe did not present to the hospital on February 13 or 14, 2022 "with a visible injury to her lip or neck." (*Id.* ¶¶ 2–3). Dr. Mastanduono based this opinion on "the unambiguous fact" that the physician assistant who examined Roe on both days "did not note any 'objective' findings of such injuries." (*Id.* ¶ 4). He distinguished between Roe's "subjective" complaints—which the physician assistant did document in detail—and the physician assistant's "objective" findings, which did not include a visible lip or neck injury. (*Id.* ¶¶ 4–6).

Dr. Mastanduono further noted that "the two photographs of what [he was] led to believe were of [Roe's] lip as of the morning of February 13, 2022, [were] not consistent with each other, appearing as if they were taken at very different times/days or are two different injuries altogether." (*Id.* ¶ 8). He opined that Roe's, R.L.'s, J.M.'s, and N.K.'s descriptions of an alleged lip injury, and the lip injury depicted in the photographs, did not align with the "independent and objective findings of no visible lip, head or neck injury ('atraumatic' head exam)" documented in the medical records. (*Id.* ¶ 10).

### 4.    Objection to Hearing Officer

Plaintiff was notified on August 24, 2022 that Defendant had hired Kelly Gallagher, a Senior Solutions Specialist at Grand River Solutions, to serve as the hearing officer for

adjudication of Roe's complaint. (Dkt. No. 1, ¶ 121). Plaintiff timely objected to Ms. Gallagher's designation as hearing officer on the grounds that (1) Ms. Gallagher "ha[d] been involved in several matters with attorneys" from the firm representing him in the instant matter and (2) his advisor, Attorney Bernstein, was lead advisor for "an accused student in a pending lawsuit in New York in which Ms. Gallagher's alleged bias and misconduct against the accused male student [wa]s the crux of the litigation." (Dkt. No. 17-20, at 3–4). Plaintiff asserted that these circumstances created at least the appearance of conflict and impropriety such that Ms. Gallagher should be removed as hearing officer. (*Id.*).

Ms. Goland "contacted Grand River Solutions," who informed her that "neither Ms. Gallagher nor anyone at Grand River Solutions [was] aware of a lawsuit in which Ms. Gallagher was named as a defendant" and that "Ms. Gallagher was unaware of any lawsuit in which any attorney from [the advisor's firm] had made any allegations against her." (Dkt. No. 17-12, ¶ 55). Ms. Goland requested that Plaintiff and his advisor provide additional information regarding the pending litigation. (Dkt. No. 17-20, at 3). Attorney Bernstein responded, informing Ms. Goland that the "entire case" to which he referred "ha[d] been sealed" and that he was "very limited with the information" he could share. (*Id.* at 2 ("In fact, the University [in that lawsuit] was prohibited from providing the complainant in that underlying Title IX matter with a copy of the Orders.")). Attorney Bernstein stated that "Ms. Gallagher [wa]s not a named defendant" but that the "crux of the lawsuit concern[ed] Ms. Gallagher's conduct at a University Title IX hearing." (*Id.*). Ms. Goland wrote to Plaintiff on August 29, 2022: "Based on your advisor's response I do not see a legal conflict between the hearing officer and yourself." (Dkt. No. 17-21, at 2).

In response to Ms. Goland's decision, Plaintiff's advisor requested that Defendant "revisit" the issue, emphasizing the "lack of freedom" he had to "ethically share more

information . . . concerning the pending lawsuit and Ms. Gallagher's conduct in that case." (Dkt. No. 22-3, at 2). Plaintiff's advisor also inquired whether Ms. Gallagher had "been notified of [Plaintiff's] request" to have her removed as hearing officer. (*Id.*). Ms. Goland declined to change her earlier decision on Plaintiff's objection, finding that Plaintiff and his advisor had provided no "additional information." (Dkt. No. 22-4, at 2). In response, Attorney Bernstein requested that a prehearing conference be scheduled and again inquired whether Ms. Gallagher had been "informed of [Plaintiff's] request and of our subsequent correspondences." (*Id.*). Ms. Goland did not respond to this inquiry. (*See* Dkt. No. 17-5, at 44).

The record before the Court indicates that Ms. Gallagher was aware of Plaintiff's objection to her serving as hearing officer. At the beginning of the hearing, Ms. Gallagher asked: "Does either party have an objection that has not already been raised and addressed related to me serving as the hearing officer?" (Dkt. No. 17-25, at 6). In an affidavit filed in opposition to Plaintiff's motion, Ms. Gallagher stated that she "recall[s]" that "Doe or his advisor objected to [her] appointment as the hearing officer" but states that she has no knowledge of the pending matter to which Plaintiff and his advisor referred. (Dkt. No. 17-1, ¶¶ 9–10). Ms. Gallagher asserts that Plaintiff's objection "played no role in [her] adjudication of the Roe–Doe complaint" and did not influence her decision-making. (*Id.* ¶ 11).

### 5.   Title IX Hearing

An adjudicatory hearing on Roe's complaint was held by videoconference on September 12–14, 2022. (Dkt. No. 17-25 (hearing transcript)). Roe, Plaintiff, and five witnesses gave testimony. (*See generally id.*). Each witness was first questioned by Ms. Gallagher. Each party's advisor then had a chance to question the witness, with Ms. Gallagher determining whether each question asked was relevant and could be answered.

E.      **Hearing Decision**

On September 28, 2022, Ms. Gallagher provided a "Hearing Summary and Decision" to the Title IX Coordinator. (Dkt. No. 17-2, at 4). After setting forth certain background procedural information, Ms. Gallagher summarized the statements made by witnesses during the investigation and at the hearing. (*See generally id.* at 2–16). As most relevant to the instant motion, Ms. Gallagher's summary does not discuss Roe's medical records or mention Dr. Mastanduono's affirmation.

Ms. Gallagher then proceeded to evaluate the credibility of the parties and witnesses and the reliability of their statements. (*Id.* at 16–20). She found that Roe's account was specific yet incomplete and that her account was corroborated by her reports to the hospital and DPS as well as photographs of her injuries. (*Id.* at 17–18). Ms. Gallagher acknowledged that, while Roe "consistently described [] the sexual encounter [as] nonconsensual," her "description of events" had "evolved over time." (*Id.* at 18). However, Roe's account did "not lack in plausibility," as Roe noted that "her alcohol consumption impacted her memory and ability to recall events" and she "consistently described an inability to recollect all events." (*Id.* at 19).

On the other hand, Ms. Gallagher found that Plaintiff's account was "detailed," "specific," and consistent. (*Id.* at 17–18). However, she found that his account was "not wholly plausible when considered in the context of other evidence," specifically the "consistent witness descriptions (corroborated by contemporaneous photographs) of [Roe's] injured lip or bruised hips and chest." (*Id.* at 19). Overall, Ms. Gallagher found Roe's description of the sexual encounter "more reliable" than Plaintiff's. (*Id.* at 20). Specifically, Ms. Gallagher reasoned:

> Complainant described consensually kissing and withdrawing consent once Respondent started to bite and grab her. Complainant's description of this withdrawal of consent has been consistent and this version of events is corroborated by the photographs provided during the investigation. Though the photographs do not have date

> or time stamps, witness accounts prior to and following the incident corroborate that they document injuries stemming from the incident. Moreover, the photographs are consistent with how Complainant described her experience of injury at the emergency room and Witness [J.M.] corroborated that she took them soon after the incident.

(*Id.*). Plaintiff's account, by contrast, was less reliable because N.K., R.L., and J.M. "observed [Roe's] lip as injured" and J.M. later "photographed bruises on [Roe's] body." (*Id.*).

Ms. Gallagher then proceeded to determine whether Plaintiff was responsible for the alleged Policy violations. (*Id.* at 20–24). Because she found Roe's description of the sexual encounter "more reliable," Ms. Gallagher found that there was "sufficient information to substantiate" that: (1) Plaintiff performed oral sex on Roe, (2) there was not consent when Plaintiff "placed his mouth on [Roe's] vagina," (3) there was not consent when Plaintiff "placed [Roe's] mouth on his penis," (4) there was not consent when Plaintiff's "penis penetrated [Roe's] vagina," and (5) Plaintiff "used force and 'choked' [Roe] during sexual intercourse." (*Id.* at 20–22). In determining that Plaintiff choked Roe, Ms. Gallagher stated that Roe's description of injuries, including at the emergency room, was "consistent with the parts of her body documented through photographs"[17] and that "[t]here is no evidence that undermines the reliability of the photographs." (*Id.* at 22). Finally, Ms. Gallagher found, based on Roe's "own account," that there was "insufficient information to substantiate" that Roe was "incapacitated and therefore incapable of consent due to alcohol." (*Id.* at 22–23).

Based on the above findings, Ms. Gallagher found that Plaintiff violated the Policy by penetrating Roe's vagina with his penis without consent, placing Roe's mouth on his penis, performing oral intercourse on Roe's vagina, and choking Roe. (*Id.* at 23–24). After consulting

---

[17] The parties have not indicated that the Title IX record included any photographs of Roe's neck specifically.

with Siena's Student Life Compliance Officer, Ms. Gallagher imposed a sanction on Plaintiff consisting of: suspension from Siena for two academic years, a notation on his transcript indicating that he was suspended after being found responsible for a code of conduct violation, notification of the case outcome to certain third-party campus offices and programs, and continuation of the no-contact order. (*Id.* at 24–25).[18]

### F.      Plaintiff's Appeal

Plaintiff appealed the hearing decision and sanction on October 7, 2022. (*See generally* Dkt. No. 17-5).  The asserted grounds for Plaintiff's appeal were (1) procedural irregularity that affected the outcome of the matter and (2) a conflict of interest or bias on the part of the adjudicator that affected the outcome of the matter. (*Id.* at 2). Plaintiff identified three procedural irregularities which he argued had a material impact on the final decision: Ms. Gallagher should have been removed as hearing officer following Plaintiff's objection, in accordance with the Policy; Defendant violated the Policy by failing to provide Plaintiff notice of the allegations he ultimately was found responsible for violating; and Defendant violated the Policy by failing to conduct an investigation within the specified time period. (*Id.* at 3–8). To challenge Ms. Gallagher's impartiality, Plaintiff argued that Ms. Gallagher improperly evaluated the credibility and reliability of Plaintiff's and Roe's accounts; improperly relied on photographs whose authenticity was challenged; ignored evidence which contradicted Roe's account; and failed to grapple with video surveillance footage, medical records, and Dr. Mastanduono's affirmation. (*Id.* at 8–19).

On October 25, 2022, the appeal panel affirmed the hearing decision. (Dkt. No. 17-6). The appeal panel met twice and "reviewed all relevant documents." (*Id.* at 3). The panel

---

[18] Plaintiff would also be subject to certain conditions should he return to Siena following his suspension. (*Id.* at 25).

"compared the outlined procedures and the documented actions taken by the College and found no procedural error that would have impacted the outcome of the hearing." (*Id.* at 4). The panel found that "any and all hearing delays were due to requests by [Plaintiff]" and not due to Defendant, and noted that the Policy provides that the College "will *endeavor* to complete the investigation portion of the process within 90 business days of issuing a notice of investigation." (*Id.* at 4–5 (emphasis added)). With regard to Plaintiff's claim of a conflict of interest on the part of Ms. Gallagher, the appeal panel "question[ed]" why Plaintiff's advisor "failed to provide any documentation in support of [the] claim, even a redacted sealing order from the court with minimal information included." (*Id.* at 5). The panel found "no evidence" to demonstrate any bias on the part of Ms. Gallagher against Plaintiff in particular or respondents more generally and concluded that none of her decisions was "arbitrary or capricious." (*Id.* at 5–6). Accordingly, the appeal panel affirmed the hearing decision and directed that the sanctions contained therein would become effective on November 1, 2022. (*Id.* at 4).

## III.     STANDARD OF REVIEW

Rule 65 of the Federal Rules of Civil Procedure governs the issuance of preliminary injunctions. A party seeking a preliminary injunction must demonstrate: (1) a likelihood of irreparable injury in the absence of an injunction; (2) a likelihood of success on the merits or sufficiently serious questions going to the merits to make them fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor; (3) that the balance of hardships tips in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction. *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015); *see also N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018).

Generally, preliminary injunctions are prohibitory or mandatory. *N. Am. Soccer League*, 883 F.3d at 36. "Prohibitory injunctions maintain the status quo pending resolution of the case;

mandatory injunctions alter it." *Id.* The "status quo . . . is[] 'the last actual, peaceable uncontested status which preceded the pending controversy.'" *Id.* at 37 (quoting *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014) (per curiam)). A party seeking a mandatory injunction "must meet a heightened legal standard by showing 'a clear or substantial likelihood of success on the merits.'" *Id.* (quoting *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012)). Here, the injunctive relief Plaintiff seeks is prohibitory. The relief sought would maintain "the last actual, peaceable uncontested status" between the parties: Plaintiff would maintain his status as an active student enrolled at Siena College. *See Doe v. Vassar Coll.*, No. 19-cv-9601, 2019 WL 6222918, at *4, 2019 U.S. Dist. LEXIS 203418, at *12 (S.D.N.Y. Nov. 21, 2019) ("In the instant case, it appears that the status quo ante was the moment before Plaintiff's suspension was imposed." (citing *Garcia v. Yonkers Sch. Dist.*, 561 F.3d 97, 107 (2d Cir. 2009))). Accordingly, Plaintiff must show "either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party." *N. Am. Soccer League*, 883 F.3d at 37.

## IV.   ANALYSIS

### A.   Irreparable Harm

A showing of irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)); *see also Doe v. Rensselaer Polytechnic Inst.*, No. 18-cv-1374, 2019 WL 181280, at *2, 2019 U.S. Dist. LEXIS 5396, at *4 (N.D.N.Y. Jan. 11, 2019). "Irreparable harm is 'injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages.'" *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 660 (2d Cir. 2015) (quoting *Forest City Daly Hous., Inc. v. Town of North Hempstead*, 175 F.3d 144, 153 (2d Cir.

1999)). "The relevant harm is the harm that (a) occurs to the parties' legal interests and (b) cannot be remedied after a final adjudication, whether by damages or a permanent injunction." *Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010) (internal footnote omitted).

Here, but for the suspension, Plaintiff would be on track to graduate in May 2023 and, as a member of Siena College's Army ROTC, to begin employment with the United States Army following graduation. (Dkt. No. 1, ¶¶ 1, 6, 45). Plaintiff asserts there is a likelihood he will suffer irreparable harm because, absent injunctive relief, he will be one semester of credits short of graduating, would "not earn his bachelor's degree on time," and would "forever have to explain to any future employer or graduate program the reason for his failure to complete his degree on time." (Dkt. No. 2-6, at 13–14; *see also* Dkt. No. 2-1, ¶¶ 6–7, 10–13). Plaintiff also states that he is "contractually obliged to commission as ROTC Second Lieutenant following graduation," that this position is "specifically contingent upon satisfactory completion of [his] degree from Siena," and that, if he does not graduate in May 2023, he will be unable to fulfill this obligation. (Dkt. No. 2-1, ¶¶ 10–12; *see id.* ¶ 12 ("It is also likely that I would not be offered another position with the ROTC after having failed to complete my degree.")). Plaintiff argues that, while money damages might compensate him for a lost salary, they "would not compensate [him] for the loss of opportunity in terms of future career success." (Dkt. No. 2-6, at 14). Defendant responds that the harms Plaintiff might suffer as a result of a delay in graduation are "quantifiable" and can be "adequately remedied by money damages" should Plaintiff prevail on the merits, and that the fact that Plaintiff "might have to explain a gap in his studies does not automatically result in a finding of irreparable harm." (Dkt. No. 17, at 11–13 (citations omitted)).

The Court concludes that Plaintiff has shown a likelihood of irreparable harm in the absence of injunctive relief. While Defendant argues that a delay in graduation is quantifiable

and can be adequately compensated by money damages, Plaintiff has demonstrated that he will suffer more than simply a delay in his graduation. Plaintiff has identified a specific job he is set to begin in summer of 2023 which is contingent upon his graduation, and he alleges that he is unlikely to be offered another similar position. *Cf. Doe v. Middlebury Coll.*, No. 15-cv-192, 2015 WL 5488109, at *3, 2015 U.S. Dist. LEXIS 124540, at *8–10 (D. Vt. Sept. 16, 2015) (finding irreparable harm where the plaintiff would lose a job "contingent on the successful completion of his degree" and "another job in [the] field will be difficult to secure because the job offers stem from successful completion of an internship offered to students entering their senior year of college"). Moreover, the Court agrees with those cases finding that a sufficient gap in studies which a plaintiff will have to forever explain to future employers constitutes irreparable harm which cannot be adequately remedied by money damages. *See, e.g.*, *Doe v. Univ. of Conn.*, No. 20-cv-92, 2020 WL 406356, at *2, 2020 U.S. Dist. LEXIS 11170, at *5 (D. Conn. Jan. 23, 2020) (finding irreparable harm where a college senior plaintiff faced a two-year suspension which was "highly likely" to "forever change the trajectory of his education and career" because he "would need to explain a gap on his résumé in future applications to schools or jobs" and a "truthful explanation would seriously hinder his prospects" (brackets and internal quotation marks omitted)); *Doe v. Middlebury Coll.*, 2015 WL 5488109, at *3 2015 U.S. Dist. LEXIS 124540, at *8–10 (finding irreparable harm where the plaintiff had a job offer "contingent on the successful completion of his degree" and concluding that "money damages cannot compensate for the loss of [the plaintiff's] senior year in college with his class, the delay in the completion of his degree, or the opportunity to begin his career . . . with this particular employment," and noting that the plaintiff "would have to explain, for the remainder of his professional life, why his education either ceased prior to completion or contains a gap"); *see also Nokes v. Miami Univ.*, No. 17-cv-

482, 2017 WL 3674910, at *13, 2017 U.S. Dist. LEXIS 136880, at *39 (S.D. Ohio Aug. 25, 2017) (declining to "embrace a rule that suspension and harm to an individual's reputation cannot constitute irreparable harm as a matter of law"). Plaintiff has asserted that, in the absence of injunctive relief, he will lose his position with the Army set to begin in the summer of 2023 and is unlikely to obtain a similar position in the future. Plaintiff would also have a notation on his transcript which would hinder his prospects in pursuing other educational or employment opportunities during the pendency of this case. Finally, even if Plaintiff ultimately prevailed on the merits, returned to Siena to complete his degree, and had his transcript cleared of any notation, he would nonetheless have to explain the gap in his education to future prospective employers or educational institutions. *Cf. King v. DePauw Univ.*, No. 14-cv-70, 2014 WL 4197507, at *13, 2014 U.S. Dist. LEXIS 117075, at *39–40 (S.D. Ind. Aug. 22, 2014) (finding, where the plaintiff would "forever have either a gap or a senior-year transfer on his record," it "inevitable that he would be asked to explain either situation by future employers or graduate school admissions committees, which would require him to reveal that he was found guilty of sexual misconduct by DePauw," the stigma associated with which would not be adequately remedied by money damages).

Many of the cases Defendants cite concluded that the plaintiff had not made a showing of irreparable harm because any harm to employment or reputation stemming from a gap in studies was too "speculative." *See, e.g.*, *Doe v. Vassar Coll.*, 2019 WL 6222918, at *6, 2019 U.S. Dist. LEXIS 203418, at *19–20 ("Plaintiff's broad assertion that he will be harmed by having to explain his suspension . . . is too speculative to warrant injunctive relief, since he has identified no plans to attend any graduate school or pursue any specific career besides professional soccer"); *Doe v. Texas A&M Univ.*, No. 20-cv-4332, 2021 WL 257059, at *7, 2021 U.S. Dist.

LEXIS 14114, at *22 (S.D. Tex. Jan. 26, 2021) (finding asserted harm to "future educational and employment prospects" to be "speculative"); *Doe v. Princeton Univ.*, No. 20-cv-4352, 2020 WL 2097991, at *7–8, 2020 U.S. Dist. LEXIS 76827, at *22 (D.N.J. May 1, 2020) (finding no irreparable harm because "the argument that Plaintiff's reputation, ability to enroll at other institutions, and ability to pursue a career would be damaged [wa]s too speculative" and because the plaintiff delayed in filing a TRO motion). Here, on the other hand, Plaintiff has identified a specific employment opportunity with the Army that he will lose and avers that it is unlikely he will be able to obtain another such position if he is suspended, (Dkt. No. 2-1, ¶¶ 9–12), rendering the asserted harm not speculative.

Plaintiff therefore has sufficiently demonstrated a likelihood of irreparable injury in the absence of an injunction.

### B.        Likelihood of Success or Serious Questions on the Merits

"To establish a likelihood of success on the merits, a plaintiff must show that he is more likely than not to prevail on his claims, or, in other words, that the 'probability of prevailing is better than fifty percent.'" *Doe v. Vassar Coll.*, 2019 WL 6222918, at *7, 2019 U.S. Dist. LEXIS 203418, at *20–21 (quoting *BigStar Ent., Inc. v. Next Big Star, Inc.*, 105 F. Supp. 2d 185, 191 (S.D.N.Y. 2000)). "However, even if a plaintiff has not demonstrated a likelihood of success on the merits, a preliminary injunction may still be granted if the plaintiff shows 'a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor.'" *Id.*, 2019 WL 6222918, at *7, 2019 U.S. Dist. LEXIS 203418, at *21 (quoting *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010)). This allows a district court to grant injunctive relief "where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *See Citigroup*

*Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010). "Because the moving party must not only show that there are 'serious questions' going to the merits[] but must additionally establish that 'the balance of hardships tips *decidedly'* in its favor,' its overall burden is no lighter than the one it bears under the 'likelihood of success' standard." *Id.* (internal citation omitted).

Plaintiff's complaint asserts four claims: (1) Title IX erroneous outcome, (2) Title IX selective enforcement, (3) breach of contract, and (4) violation of the NYSHRL. (Dkt. No. 1, ¶¶ 209–60).

### 1.    Title IX Erroneous Outcome Claim[19]

Title IX provides, with certain exceptions not relevant here: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "Because Title IX prohibits (under covered circumstances) subjecting a person to discrimination on account of sex, it is understood to 'bar[] the imposition of university discipline where gender is a motivating factor in the decision to discipline.'" *Noakes v. Syracuse Univ.*, 369 F. Supp. 3d 397, 413 (N.D.N.Y. 2019) (quoting *Doe v. Columbia Univ.*, 831 F.3d 46, 53 (2d Cir. 2016)). Title IX claims based on disciplinary proceedings generally fall into two categories: (1) erroneous outcome cases, where the plaintiff claims he is "innocent and wrongly found to have committed an offense," and (2) selective enforcement cases, which assert that, "regardless of the student's guilt or innocence, the severity

---

[19] Plaintiff's claim for violation of the NYSHRL is evaluated under the same standard as his Title IX claims. *See Doe v. Colgate Univ.*, 457 F. Supp. 3d 164, 170 n.3 (N.D.N.Y. 2020) (citing *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 n.1 (2d Cir. 2000)). The Court therefore does not address the NYSHRL claim separately.

of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994).

For an erroneous outcome claim, where the plaintiff claims he is innocent but was wrongly found to have committed a disciplinary offense, the plaintiff must allege "particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding" and that "gender bias was a motivating factor" behind the erroneous outcome. *Id.* Plaintiff argues that he is likely to succeed on his Title IX erroneous outcome claim because he has set forth "a myriad of both procedural and substantive flaws casting doubt on the accuracy of Siena's adjudication finding him responsible for sexual assault" as well as facts showing a "clear influence of gender bias" on that outcome. (Dkt. No. 2-6, at 17–22).[20] Defendant responds that Plaintiff is not likely to succeed on an erroneous outcome claim because Ms. Gallagher did ask questions "concerning Roe's injuries and purported inconsistencies related thereto," Plaintiff's advisor had the opportunity to ask questions pertaining to Roe's credibility, and there is no evidence of gender bias. (Dkt. No. 17, at 16–19).

The Court concludes that Plaintiff has demonstrated a likelihood of establishing "some articulable doubt" regarding the accuracy of the Title IX proceeding outcome. To establish "articulable doubt," a plaintiff must "point to evidence of 'particular evidentiary weaknesses behind the finding of an offense,'" "particularized strengths of the defense," "particular procedural flaws affecting the proof," or "other reason to doubt the veracity of the charge." *Doe*

---

[20] Plaintiff inaptly relies on cases ruling on motions to dismiss for the proposition that Plaintiff's pleading burden is not heavy and that Plaintiff must only demonstrate minimally plausible inferences of gender discrimination. (Dkt. No. 2-6, at 17–19). The burden Plaintiff must meet for a preliminary injunction is not the same as the pleading standard required to survive a motion to dismiss. *See Doe v. Vassar Coll.*, 2019 WL 6222918, at *11, 2019 U.S. Dist. LEXIS 203418, at *37 ("There is no indication that the plaintiff's ability to meet [*Doe v. Columbia*'s] minimal standard indicates that he presents a serious question on the merits for the purposes of demonstrating entitlement to a preliminary injunction.").

*v. Syracuse Univ.*, 457 F. Supp. 3d 178, 200 (N.D.N.Y. 2000) (quoting *Yusuf*, 35 F.3d at 715).

Here, among other things, Plaintiff has identified "particular evidentiary weaknesses" behind

Defendant's finding of responsibility, including particular "exculpatory evidence" that Ms.

Gallagher "ignore[ed]" in her decision. (Dkt. No. 21, at 6; *see also* Dkt. No. 2-6, at 18; Dkt. No.

1, ¶ 218). Specifically, Ms. Gallagher's hearing decision does not meaningfully consider, or fails

to mention entirely: (1) security video footage which shows Roe after the incident with no visible

injuries; (2) the reports of DPS and Community Learning which do not note any injuries to Roe

on February 13; (3) Roe's medical records from February 13 and 14 documenting no objective

indication of a lip or neck injury; and (4) Dr. Mastanduono's sworn affirmation opining that Roe

did not present to the emergency room with a visible lip injury on February 13 or 14.

In addition to failing to address this exculpatory evidence, the hearing decision found Roe

to be more credible than Plaintiff, largely on the ground that contemporaneous photographs

corroborated her account of her injuries. (*See* Dkt. No. 17-2, at 17–20). Plaintiff asserts,

however, that the photographs in question are undated and that questions were raised regarding

their authenticity. (*See, e.g.*, Dkt. No. 1, ¶¶ 140–41). Indeed, Roe's account of who took the

photographs and when evolved over the course of the Title IX investigation and proceeding. Ms.

Gallagher nonetheless stated that there was "no evidence that undermine[d] the reliability of the

photographs." (Dkt. No. 17-2, at 22). This conclusion ignores evidence which did in fact

undermine the reliability of the photographs, including: (1) that witnesses R.P. and G.M. noted

no injuries on Roe; (2) security video footage showing no visible injuries on Roe; (3) reports

prepared by officials at DPS and Community Learning following a meeting with Roe on

February 13 which do not note any injuries; (4) hospital medical records which, while

documenting Roe's subjective complaints, documented no objective findings indicating the

presence of such injuries; and (5) Dr. Mastanduono's affirmation opining that Roe did not

present to the hospital with a visible lip or neck injury. Ms. Gallagher's decision offers no

explanation for her failure to mention or her discounting of this evidence.

Importantly, these evidentiary weaknesses and gaps in Ms. Gallagher's analysis bear

directly on the credibility of the witnesses. Because the outcome of the proceeding in large part

hinged on the parties' credibility, Plaintiff has raised an articulable doubt as to the accuracy of

the outcome. *Cf. Doe v. Trs. of Dartmouth Coll.*, No. 22-cv-18, 2022 WL 2704275, at *7, 2022

U.S. Dist. LEXIS 122459, at *18 (D.N.H. July 12, 2022) (finding that the plaintiff had plausibly

alleged articulable doubt where the university discounted the plaintiff's credibility and "the

evidence was largely [complainant's] word against [the plaintiff's]").

With regard to whether gender bias was a motivating factor behind the alleged erroneous

outcome, Plaintiff alleges that (1) Defendant "received negative media attention for its previous

failure to adequately monitor its housing," which "allow[ed] a female student to be raped"; (2)

the Department of Education Office for Civil Rights had "launched hundreds of investigations

into colleges and universities for alleged failures to adequately respond to female students'

complaints of sexual misconduct"; (3) statements of Defendant's administrators "made clear that

they viewed the issue as one affecting women in particular"; and (4) Defendant "blatant[ly]"

treated Plaintiff and Roe differently. (Dkt. No. 2-6, at 20). Defendant responds that there is no

evidence that any "outside pressure" influenced the proceeding and that there is "no statistical

support" for the argument that pressure on the College has "resulted in bias against males." (Dkt.

No. 17, at 17–19).

Here, Plaintiff has asserted that the hearing officer's decision "failed to acknowledge or

note exculpatory evidence in favor of Plaintiff" despite accepting Roe's "continually evolv[ing]"

story and relied on "highly questionable, suspect, and entirely unreliable pieces of evidence," including undated photographs and contradictory testimony. (Dkt. No. 1, ¶¶ 156–59, 161–74). "When the evidence substantially favors one party's version of a disputed matter, but an evaluator forms a conclusion in favor of the other side (without an apparent reason based in the evidence), it is plausible to infer (although by no means necessarily correct) that the evaluator has been influenced by bias," although not necessarily gender bias. *Columbia Univ.*, 831 F.3d at 57. The hearing decision's failure to address or even mention certain exculpatory evidence, as set forth more fully above, is sufficient to support an inference of bias on the part of the evaluator.

Moreover, the Court concludes that Plaintiff has raised serious questions on the merits as to whether *gender* bias was a motivating factor behind the alleged erroneous outcome. First, there are serious questions as to whether Ms. Goland exhibited gender bias. At the initial meeting on March 3, she was dismissive of the idea that Plaintiff, a male student, could have been assaulted by Roe, a female student. Ms. Goland also had previously expressed her lack of support for the new Title IX regulations and the opportunity for cross-examination, which she was concerned could deter reports of assaults, in Title IX proceedings. *See Yusuf*, 35 F.3d at 715 (noting that allegations "relating to a causal connection between the flawed outcome and gender bias" might include "statements by pertinent university officials . . . that also tend to show the influence of gender").[21] As the parties agree, Ms. Goland was meaningfully involved throughout the entire process of investigating and adjudicating Roe's complaint against Plaintiff, including by preparing the notice of investigation, assigning the investigator, and convening the appeals panel. Significantly, Ms. Goland also considered and rejected Plaintiff's objection to Ms.

---

[21] Defendant's own data of sexual misconduct complaints reveal that such complaints primarily involve female complainants. (Dkt. No. 17-11).

Gallagher's serving as hearing officer, despite knowing that the "crux" of the pending lawsuit involved Ms. Gallagher's alleged bias towards a *male* student in a Title IX disciplinary hearing, Attorney Bernstein was the attorney in that lawsuit, and Attorney Bernstein was not at liberty to disclose any further information about the lawsuit, which had been filed under seal. Ms. Goland therefore "played a meaningful role" in the process of investigating and adjudicating Roe's complaint. *See Holcomb v. Iona Coll.*, 521 F.3d 130, 143 (2d Cir. 2008) (noting, in the Title VII context, that a plaintiff will succeed, "even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the process" (ellipses and citation omitted)). Thus, given all of the evidence here, including Ms. Gallagher's awareness of Plaintiff's objection to her serving as hearing officer, the totality of Plaintiff's allegations regarding pressure on the College, and the serious question, discussed below, regarding whether Ms. Gallagher applied the preponderance of the evidence standard required by the Policy, *see Vengalattore v. Cornell Univ.*, 36 F.4th 87, 106–07 (2d Cir. 2022) ("Given that 'procedural irregularity alone' may suggest some form of bias, when there are 'clear procedural irregularities in a university's response to allegations of sexual misconduct' we have concluded that 'even minimal evidence of sex-based pressure on the university is sufficient' to permit a plausible inference that the "bias [was] on account of sex." (citation omitted)), Plaintiff has raised serious questions on the merits of his Title IX erroneous outcome claim.[22]

### 2.      Breach of Contract

To establish a breach of contract claim under New York law, a plaintiff must show: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3)

---

[22] The Court therefore does not address Plaintiff's Title IX selective enforcement claim.

breach of the contract by the defendant, and (4) damages." *Habitzreuther v. Cornell Univ.*, No. 14-cv-1229, 2015 WL 5023719, at *5, 2015 U.S. Dist. LEXIS 112209, at *13–14 (N.D.N.Y. Aug. 25, 2015) (quoting *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004)).

      Under New York law, "an implied contract is formed when a university accepts a student for enrollment: if the student complies with the terms prescribed by the university and completes the required courses, the university must award him a degree." *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 93 (2d Cir. 2011) (citing *Carr v. St. John's Univ.*, 17 A.D.2d 632, 633 (2d Dep't), *aff'd*, 12 N.Y.2d 802 (1962)). The terms of the implied contract are "contained in the university's bulletins, circulars and regulations made available to the student." *Id.* (quoting *Vought v. Teachers Coll., Columbia Univ.*, 127 A.D.2d 654, 654 (2d Dep't 1987)). "Implicit in the contract is the requirement that the institution 'act in good faith in its dealing with its students.'" *Id.* (quoting *Olsson v. Bd. of Higher Educ.*, 49 N.Y.2d 408, 413–14 (1980)). At the same time, "the student must fulfill [his] end of the bargain by satisfying the university's academic requirements and complying with its procedures." *Id.* (quoting *Gally v. Columbia Univ.*, 22 F. Supp. 2d 199, 206 (S.D.N.Y. 1998)). To "state a claim for breach of such a contract, a student must identify 'specifically designated and discrete promises.'" *Nungesser v. Columbia Univ.*, 169 F. Supp. 3d 353, 370 (S.D.N.Y. 2016) (quoting *Ward v. New York Univ.*, No. 99-cv-8733, 2000 WL 1448641, at *4, 2000 U.S. Dist. LEXIS 14067, at *11 (S.D.N.Y. Sept. 28, 2000)). "'General policy statements' and 'broad and unspecified procedures and guidelines' will not suffice. *Id.* (quoting *Ward*, 2000 WL 1448641, at *4, 2000 U.S. Dist. LEXIS 14067, at *10); *see also Gally*, 22 F. Supp. 2d at 207 ("[G]eneral promises about ethical standards" that are

"subject to neither quantification nor objective evaluation" "are far different from the types of specific promises which have led to valid breach of contract claims against universities.").

Here, the parties agree that the Policy constitutes terms of agreement between Defendant and Plaintiff. Plaintiff asserts a breach of contract cause of action, alleging that Defendant breached the Policy in a number of ways.[23]

### a.     Fair and Impartial Process

Plaintiff first argues that Defendant breached the Policy by failing to "provide a process" throughout the course of its investigation and adjudication of Roe's complaint that "was fair and impartial." (Dkt. No. 1, ¶ 243(a)). Section I of the Policy provides: "Siena College proceedings that involve alleged violations of this policy will be conducted through a process that is prompt, equitable, fair, [and] impartial, and provides adequate notice and a meaningful opportunity to be heard, as outlined below and in accordance with applicable law." (Dkt. No. 17-13, at 3). However, a "commitment to provide a 'fair and impartial' process is too generic to be an enforceable promise" which can form the basis of a breach of contract claim. *Feibleman v. Trs. of Columbia Univ.*, No. 19-cv-4327, 2020 WL 882429, at *18, 2020 U.S. Dist. LEXIS 31499, at *50 (S.D.N.Y. Feb. 24, 2020); *see also Noakes*, 369 F. Supp. 3d at 420 (holding that "[p]rovisions that students will be treated in a 'fundamentally fair' manner . . . are the sorts of non-actionable statements of general policy that courts applying New York law have held cannot support a breach of contract claim"). Accordingly, Plaintiff has not demonstrated a likelihood of success or serious questions on the merits of a breach of contract claim premised on Defendant's alleged failure to provide a fair and impartial process.

---

[23] The Court does not address Plaintiff's claim that Defendant violated the Policy by failing to apply the presumption of non-responsibility. (*See* Dkt. No. 1, ¶ 243(c)).

b.      **Timely Investigation**

Plaintiff alleges that Defendant breached the Policy by "fail[ing] to complete the

investigation and adjudication within the time period prescribed by the Policy" and "fail[ing] to

provide Plaintiff appropriate written notice for the basis for such extensions." (Dkt. No. 1,

¶ 243(b)). Section X.J. of the Policy provides:

> The College will endeavor to complete the investigation portion of
> the process within 90 business days of issuing a notice of
> investigation . . . , but this may be extended at the College's
> discretion due to factors such as the complexity of the matter, the
> availability of witnesses, requests by law enforcement agency for a
> temporary delay in the investigation process, College breaks, and
> other legitimate reasons.

(Dkt. No. 17-13, at 28). Here Plaintiff was not even interviewed about this incident until more

than 90 days had passed and Mr. D'Antonio had interviewed seven other individuals. (Dkt. No.

17-18, at 4). The record does not reflect why Plaintiff was not interviewed in a timely manner. It

is undisputed that Mr. D'Antonio's preliminary investigative report was not made available to

the parties until July 7, 2022, more than 90 business days after the February 24, 2022 notice of

investigation.

The Court concludes that Plaintiff has not demonstrated a likelihood of success or serious

questions of the merits of a breach of contract claim premised on Defendant's alleged failure to

complete the investigation within 90 business days or provide written notice of the reasons for

extensions. By the plain terms of the Policy, Defendant was obligated only to "endeavor" to

complete the investigation within that time frame, and Plaintiff points to nothing in the Policy

requiring Defendant to give written notice of the basis for its extending the investigation beyond

90 business days. *Cf. Doe v. Syracuse Univ.*, 440 F. Supp. 3d 158, 178 (N.D.N.Y. 2020) (finding

that the plaintiff had plausibly alleged a breach of contract claim where the university's

handbook provided that an investigation and decision "*will be* concluded within 60 days of the

original complaint" and required the university to send "written notification" of any delay and its cause (emphasis added)).

### c.        Preponderance of the Evidence Standard

Section XI of the Policy provides that the "preponderance of evidence or 'more likely than not' standard of review will be used during the formal resolution process." (Dkt. No. 17-13, at 28). Plaintiff asserts that Defendant breached the Policy by failing to apply this preponderance of the evidence standard because "the evidence in this case overwhelmingly supported Plaintiff's version of the events and completely disproved Roe's version of events, yet Plaintiff was inexplicably found responsible." (Dkt. No. 1, ¶ 199; *see also* Dkt. No. 2-6, at 26). Defendant responds that Plaintiff "does not identify" how it failed to apply the preponderance of the evidence standard. (Dkt. No. 17, at 23).

As an initial matter, the Policy's provision that a preponderance of evidence standard will apply during the formal resolution process is an "expressly enumerated" right which can form the basis of a breach of contract claim. *Doe v. Syracuse Univ.*, 440 F. Supp. 3d at 179; *Doe v. Hobart & William Smith Colls.*, 546 F. Supp. 3d 250, 273 (W.D.N.Y. 2021) ("agree[ing]" that a provision mandating "application of the preponderance of the evidence standard" was "specifically specific and concrete to form the basis for a breach of contract claim"). Moreover, while the hearing decision does state that "the standard used to evaluate the evidence and make findings and determinations in this matter is the preponderance of the evidence, meaning 'more likely than not,'" (Dkt. No. 17-2, at 5), Plaintiff has raised serious questions as to whether the hearing decision was a "result-driven determination" in which Defendant failed to apply this standard, *cf. Doe v. Syracuse Univ.*, 440 F. Supp. 3d at 179. As set forth more fully above, *supra* Section IV.B.1, Ms. Gallagher's hearing decision failed to assess the entirety of the record, ignored exculpatory evidence and evidence which contradicted Roe's and her friends' accounts,

and relied heavily on photographic evidence whose reliability had been questioned, without explanation. *Cf. Doe v. Princeton Univ.*, 30 F.4th 335, 347 (3d Cir. 2022) (allowing breach of contract claim for failure to apply preponderance of evidence standard to proceed where the plaintiff had alleged that the university "disregard[ed] evidence that tended to inculpate Roe and exculpate Doe," "failed to consider the entirety of the evidence with a neutral gaze, disregarded exculpatory evidence, and rendered inconsistent and skewed credibility determinations" (internal quotation marks and brackets omitted)). The Court therefore concludes that Plaintiff has shown at least serious questions on the merits of a breach of contract claim asserting that Defendant failed to apply the preponderance of the evidence standard in resolving Roe's complaint against him.

### d.      Adequate Notice of Charges

Under Defendant's Policy, the written notice of investigation must include a "statement of the allegations of behavior potentially constituting Prohibited Conduct, including sufficient details known at the time and with sufficient time to prepare a response before any initial post-intake interview. Sufficient details include the identities of the parties involved in the incident, if known, the conduct allegedly constituting Prohibited Conduct, and the date and location of the alleged incident, if known." (Dkt. No. 17-13, at 26). Section X.H of the Policy further provides: "If in the course of an investigation the College decides to investigate allegations about any party that are not included in the notice [of investigation] described above, it will provide notice of the additional allegations to the parties whose identities are known." (*Id.* at 27). Plaintiff argues that Defendant breached this provision of the Policy "by only informing Plaintiff that the issue of consent was being investigated under an incapacitation theory, and never informing Plaintiff of a

general consent theory before finding him responsible for sexual assault." (Dkt. No. 1, ¶ 197).[24] Defendant responds that the notice of investigation informed Plaintiff of all the allegations analyzed by Ms. Gallagher. (Dkt. No. 17, at 17).

At this stage, the Court concludes that Plaintiff has not demonstrated a likelihood of success on the merits or serious questions going to the merits of a breach of contract claim premised on the adequacy of the notice or Defendant's failure to inform him of "additional allegations" it decided to investigate. First, the February 24 notice of investigation gives Plaintiff notice of the three Policy provisions for which he could be found responsible: "non-consensual sexual intercourse and oral sex" and "severe and pervasive sexual harassment," by the use of "force and chok[ing] [Roe] while engaging in non-consensual sexual intercourse." (Dkt. No. 2-3, at 2). The notice stated that Roe "further alleges she was incapacitated and therefore incapable of consent due to alcohol." (*Id.*). Given the notice's repeated references to "non-consensual" sexual intercourse, the Court finds Plaintiff has not raised a serious question that Roe's lack of consent, as opposed to incapacitation due to alcohol, was an "additional allegation" of which Defendant was obligated to give him notice under the Policy.

### e.    Failure to Remove Hearing Officer

Section XI.A. of the Policy provides:

> Hearing officers will be appointed by the Title IX Coordinator/EOS or designee. In selecting a hearing officer for a particular matter, the Title IX Coordinator/EOS or designee will take care to select an individual who does not have a conflict of interest or bias against Complainants or Respondents generally or an individual Complainant or Respondent. The College will notify the parties of

---

[24] Plaintiff also alleges a breach of contract claim premised on Defendant's failure to "follow its own definitions and guidelines for affirmative consent and incapacitation." (Dkt. No. 1, ¶ 243(e)). Plaintiff has not articulated how Defendant violated the Policy definitions, especially as distinct from the argument that Plaintiff did not receive adequate notice of the charges against him. (*See id.* ¶ 194 ("[T]he Policy makes clear that a theory of incapacitation is separate and apart from a general theory of non-consent, and as such, Plaintiff was not aware of the exact theory under which he was being investigated.")).

> the identity of the hearing officer in advance of the hearing, and parties may, within three (3) business days of such notice, object to the service of the hearing officer by providing a written statement (which may be transmitted electronically) as to why the party believes that the hearing officer has a conflict of interest or bias. The Title IX Coordinator/EOS or designee will make decisions regarding such objections and the appointment of an alternate hearing officer, as necessary.

(Dkt. No. 17-13, at 31). Plaintiff asserts that Defendant breached this Policy provision by appointing Ms. Gallagher as hearing officer when she had a conflict of interest and a "clear bias against Plaintiff as a male respondent," refusing to remove Ms. Gallagher as hearing officer upon Plaintiff's objection, and informing Ms. Gallagher of Plaintiff's objection. (Dkt. No. 1, ¶ 196). Defendant responds that it had no "specific information to evaluate the asserted conflict of interest" and that, in any event, any allegations regarding Ms. Galagher were "unrelated" to Plaintiff, Roe, or Siena College. (Dkt. No. 17, at 24).

As an initial matter, the Court notes that the Policy does not require Defendant to remove a hearing officer upon a party's objection. Plaintiff has not addressed whether the provision that Defendant will "take care" to select a hearing officer free from bias or a conflict of interest is a sufficiently specific and discrete promise, *Nungesser*, 169 F. Supp. 3d at 370. Thus, at this stage Plaintiff has failed to show a likelihood of success or raise serious questions on the merits of a breach of contract claim premised on Defendant's failure to remove Ms. Gallagher as hearing officer.

### f.       Covenant of Good Faith and Fair Dealing

Finally, Plaintiff asserts that Defendant breached the implied covenant of good faith and fair dealing by acting "with bias" against Plaintiff and otherwise acting arbitrarily. (Dkt. No. 2-6, at 26–27; *see also* Dkt. No. 1, ¶¶ 244–46). New York law "does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of

contract claim, based upon the same facts, is also pled." *Nungesser*, 169 F. Supp. 3d at 372–73

(citation omitted). Plaintiff has not demonstrated serious questions on the merits of a claim that

Defendant breached the covenant of good faith and fair dealing because it appears that this claim

rests on the same allegations as his other breach of contract claims. *Cf. Doe v. Colgate Univ.*, No.

15-cv-1069, 2017 WL 4990629, at *24, 2017 U.S. Dist. LEXIS 180267, at *78 (N.D.N.Y. Oct.

31, 2017) ("Plaintiff's good faith and fair dealing cause of action relies on the same facts as his

breach of contract claim—specifically, that the panel found him responsible for sexual

misconduct and expelled him despite insufficient evidence.").

### C.      Balance of Hardships

"[T]he balance of hardships inquiry asks which of the two parties would suffer most

grievously if the preliminary injunction motion were wrongly decided." *Goldman, Sachs & Co.

v. Golden Empire Schs. Fin. Auth.*, 922 F. Supp. 2d 435, 444 (S.D.N.Y. 2013) (alteration in

original) (quoting *Tradescape.com v. Shivaram*, 77 F. Supp. 2d 408, 411 (S.D.N.Y. 1999)).

Where a plaintiff cannot demonstrate a likelihood of success on the merits but only serious

questions going to the merits to make them fair ground for litigation, the plaintiff must show that

the balance of hardships tips "decidedly" in favor of the plaintiff. *See Doe v. Vassar Coll.*, 2019

WL 6222918, at *7, 2019 U.S. Dist. LEXIS 203418, at *21; s*ee also Citigroup Glob. Mkts.*, 598

F.3d at 35.

Plaintiff faces significant hardships by having his educational and professional paths

disrupted. (Dkt. No. 2-1 ¶¶ 6–7, 9–12). Plaintiff will be prevented from earning his degree on

time and will lose his employment offer. (*Id.*). The Court is mindful that "colleges have a

difficult role in dealing with allegations of sexual misconduct," *Doe v. Middlebury Coll.*, 2015

WL 5488109, at *4, 2015 U.S. Dist. LEXIS 124540, at *13, and "designing and implementing

[their] own disciplinary proceedings," *Doe v. Univ. of Conn.*, 2020 WL 406356, at *5, 2020 U.S.

Dist. LEXIS 11170, at *16. Even so, while Defendant "will suffer interference with its process and sanction if the Court grants the motion, if [Defendant] prevails on the merits, it can . . . revoke[] Plaintiff's diploma and maintain Plaintiff's disciplinary record in its files." *Doe v. Middlebury Coll.*, 2015 WL 5488109, at *4, 2015 U.S. Dist. LEXIS 124540, at *13. "The harm [Defendant] will suffer if Plaintiff is allowed to remain a student . . . is not as great as the harm Plaintiff will suffer if he is not permitted to [remain actively enrolled] but ultimately prevails in the case." *Id.*, 2015 WL 5488109, at *4, 2015 U.S. Dist. LEXIS 124540, at *13–14 (citing *King*, 2014 WL 4197507, at *14, 2014 U.S. Dist. LEXIS 117075, at *41). Indeed, throughout the investigation and adjudication of Roe's complaint, which took almost eight months, Plaintiff remained a student on campus without incident. And a "win by [Defendant] would vindicate its policies and its process in this case," as Plaintiff will "still have been found responsible for sexual misconduct" and will face significant consequences. *King*, 2014 WL 4197507, at *14, 2014 U.S. Dist. LEXIS 117075, at *42.

Therefore, the Court concludes that the balance of hardships tips decidedly in Plaintiff's favor.

### D.     Public Interest

"[T]he court must ensure that the 'public interest would not be disserved' by the issuance of a preliminary injunction." *Salinger*, 607 F.3d at 80. "While the public interest lies in maintaining campus safety," *Doe v. Middlebury Coll.*, 2015 WL 5488109, at *4, 2015 U.S. Dist. LEXIS 124540, at *14, and "in enforcement of university disciplinary policies," *Doe v. Univ. of Conn.*, 2020 WL 406356, at *6, 2020 U.S. Dist. LEXIS 11170, at *17, Plaintiff continued his studies during the course of Siena's investigation without issue, (Dkt. No. 2-1, ¶¶ 5, 8; Dkt. No. 2-6, at 28). And as discussed, Siena can still fully enforce its disciplinary policies by revoking Plaintiff's diploma and "maintain[ing] Plaintiff's disciplinary record in its files" if it prevails in

this case." *Doe v. Middlebury Coll.*, 2015 WL 5488109, at *4, 2015 U.S. Dist. LEXIS 124540, at *13.

The Court therefore concludes that the public interest would not be disserved by the issuance of an injunction.

## V.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Plaintiff's motion for a preliminary injunction (Dkt. No. 2) is **GRANTED**; and it is further

**ORDERED** that Defendant is immediately enjoined and restrained from enforcing its October 25, 2022 final decision suspending Plaintiff from Siena College for two years and placing a notation on his transcript that he was suspended pending the final resolution of this action, and directed to timely confer Plaintiff's degree upon the successful completion of the requirements therefor.

**IT IS SO ORDERED.**

Dated:  <u>January 17, 2023</u>
        Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge

45